NELSON L. TYLER *vs.* ALANSON S. POMEROY & others.

Merely signing a paper in the hands of a municipal officer, containing a promise to serve as a volunteer for three years from the date of being mustered into the United States service, unless sooner discharged, is not sufficient to constitute one a soldier, and render him liable to be seized against his will and taken into camp; and for such a seizure by municipal officers and their agents, he may maintain an action against them, and may prove, in aggravation of damages, his mental suffering caused by the injury, and also the fact of his confinement in the guard tent, upon and immediately after being taken into camp.

In such action, votes of the town where the plaintiff lived and signed the paper referred to, instructing the selectmen to cause all enlisted men to be taken to camp, the plaintiff's declaration and acts showing his intention to enlist as a soldier, and the facts that others who signed the same paper with the plaintiff entered into the military service, that the paper signed by the plaintiff was in the usual form for enlisting recruits, and that persons who signed such papers were usually held to military service, are alike incompetent.

If in such action one of the defendants has denied on cross-examination that he said, after the seizure of the plaintiff, " We have got him, and I hope they will send him to Fort Warren," the plaintiff may introduce evidence to contradict him.

TORT against the selectmen of Washington and two other persons, to recover damages for an assault and battery upon, and an unlawful arrest and imprisonment of, the plaintiff. The defence was that the plaintiff enlisted as a volunteer in the military service of the United States, as one of the quota of the town of Washington; that the selectmen duly received him as such; that they used no coercion upon the plaintiff; and that if an arrest of the plaintiff by either of the defendants should be proved, it was made under the authority of the selectmen, as special recruiting officers.

At the trial in the superior court, before *Vose,* J., the following facts appeared: Two of the defendants were selectmen of Washington, and, under the call of the president of the United States, made on the 2d of July 1862, for 300,000 volunteers, the governor of the Commonwealth issued an order on the 14th of July authorizing the chairman of the selectmen of Washington to enlist seven men. With this order a paper was sent, of which the following is a copy: " United States Volunteer Enlistment List. We, the undersigned, by our signatures hereto annexed, do severally agree to serve for a period of three years from the date of our being mustered into the United States service, unless sooner discharged, as volunteers from Massachusetts, in the force authorized by an act of congress of the United States, approved on the 22d day of July A. D. 1861, entitled 'An act to authorize the employment of volunteers to aid in enforcing the laws and protecting public property,' in accordance with the provision of said act and other acts in addition thereto, and, if ordered into camp and our number is not filled to the maximum number of one hundred and one on or before the day of        , we severally agree to serve in such companies as the governor and commander-in-chief may designate." Various other orders and instructions relative to this recruitment were also sent from time to time, which were put in evidence at the trial, and copies of which were annexed to the bill of exceptions, and all of which are sufficiently referred to in the opinion. While the above paper was in the hands of one of the selectmen, to whom it had been given by the chairman, the plaintiff,

Tyler *v.* Pomeroy & others.

on the 29th of July, signed it. On the 11th of July he had signed a written agreement with one Higgins, reciting that they had each put into the hands of Justin Morgan one hundred dollars, to hold in trust, with the agreement that they would enlist in the military service of the United States within ten days, and each upon so enlisting should receive back his one hundred dollars, and if either did not so enlist, the other, upon so enlisting, should receive the whole money. The plaintiff, after signing the enlistment paper, refused to go into camp, upon the request of the chairman of the selectmen, and the selectmen thereupon gave directions for him to be taken to camp, and these directions were executed by the other two defendants, (one of whom was a constable,) who went to the plaintiff's house and arrested him and carried him to the camp in Pittsfield, and delivered him, with the enlistment roll, to the commandant of the camp of rendezvous, who was a commissioned officer of volunteers. The plaintiff was, by order of the commandant, confined in the guard tent of the camp for several days, after which he was released, the regiment having received marching orders.

The evidence as to the reasons and circumstances of his commitment to the guard tent was conflicting; and the plaintiff was permitted to prove, under objection, his treatment and situation there.

The defendants offered to prove various acts and declarations of the plaintiff, in war meetings of the town of Washington, for the purpose of raising their quota, tending to show that by signing the said roll he intended to place himself in the military service of the United States, and also in reduction of damages; his receipt, in consequence of signing said roll, of the money deposited under the agreement with Higgins; a vote of the town instructing the selectmen to cause all enlisted men to be taken to camp, under which vote the selectmen acted; and the fact that others who subscribed the same roll entered into the military service; but the evidence was excluded.

The defendants also called as a witness the adjutant general of the Commonwealth, and offered to ask him whether this roll was the regular and usual form of enlistment in this

commonwealth ; whether the quota from this state was enlisted upon similar rolls ; and whether persons enlisted upon similar rolls were actually held to service ; but the evidence was excluded.

The foregoing evidence was offered for the purpose, among other reasons, of showing good faith on the part of the defendants, and in mitigation of damages.

Alanson Pomeroy, one of the defendants, having denied on cross-examination that he said, after the arrest of the plaintiff, " We have got him now, and I hope they will send him to Fort Warren before he gets back," the plaintiff in reply was allowed to call evidence, under objection, to contradict him on this point.

The judge instructed the jury that, upon the evidence, the defendants had no lawful authority to use force upon the plaintiff, in order to take him to camp ; and gave instructions as to what in law constitutes an arrest, which were not excepted to ; and further instructed them, upon the question of damages, that the plaintiff was entitled to recover a just compensation for any injury to his person, and for the detention and suffering in the guard tent, and for any injury to his feelings in consequence of the mode and circumstances of the unlawful force used towards him.

The jury returned a verdict for the plaintiff, with $150.87 damages ; and the defendants alleged exceptions.

*J. M. Barker,* (*J. D. Colt & C. N. Emerson* with him,) for the defendants. The defendants had authority to enlist volunteers, and duly enlisted the plaintiff. [The Const. of U. S., acts of congress, orders, &c., and various cases cited in the opinion were referred to, and also the following :] *In re Merritt,* 5 Hall's Law J. 497. *Mills* v. *Martin,* 19 Johns. 7. *Rathbun* v. *Martin,* 20 Johns. 343. By the plaintiff's disobedience of orders, he became liable to arrest. [See orders and authorities referred to in opinion.] If not a soldier of the United States, he was a soldier of the Commonwealth. [See above orders and authorities.] *Savage* v. *Gibbs,* 4 Gray, 601. The excluded evidence was competent. 1 Greenl. Ev. § 120. *In re Merritt,*

*ubi supra.* *United States* v. *Wyngall,* 5 Hill, (N. Y.) 21. *Schuneman* v. *Diblee,* 14 Johns. 235. Damages for his detention in the guard tent were too remote. *Houghton* v. *Wilson,* 10 Gray, 365. *Allen* v. *Shed,* 10 Cush. 375. *Lock* v. *Ashton,* 12 Q. B. 871. The defendants were acting under superiors, whose orders they could not control. *Ela* v. *Smith,* 5 Gray, 142, and cases cited. Evidence of the good faith of the defendants was competent. Sedgwick on Damages, (2d ed.) 114, 154.

*H. L. Dawes,* (*M. Wilcox* with him,) for the plaintiff.

GRAY, J. Questions of the lawfulness of acts done under color of military authority, in time of war, are among the most delicate and important that can come before a court of justice, whose duty it is equally to maintain the rightful powers of the government and to guard the subject against unlawful violence. But when their decision becomes necessary to the determination of the rights of the parties in a judicial proceeding, they must be treated in the same manner as any other question of law.

Although cases of this kind have fortunately never been common, the general principles which must guide the inquiry are well settled and may be briefly stated. With acts affecting military rank or *status* only, or offences against articles of war or military discipline, the civil courts have uniformly declined to interfere. *Barwis* v. *Keppel,* 2 Wils. 314. *In re Mansergh,* 1 Best & Smith, 406, 407, 408. *Johnstone* v. *Sutton,* 1 T. R. 546, 548, 549 ; S. C. *nom. Sutton* v. *Johnstone,* Ib. 784 ; S. C. 1 Bro. P. C. (2d ed.) 100. *United States* v. *Mackenzie,* 1 N. Y. Leg. Obs. 371. 1 Kent Com. (6th ed.) 341, *note.* No acts of military officers or tribunals, within the scope of their jurisdiction, can be revised, set aside or punished, civilly or criminally, by a court of common law. *Leonards* v. *Shields,* 1 McArthur on Courts Martial, (3d ed.) 159, *note,* 296 ; 2 Ib. 263, 264. *Grant* v. *Gould,* 2 H. Bl. 69. *Bailey* v. *Warden,* 4 M. & S. 400. *Wolton* v. *Gavin,* 16 Q. B. 48. *Luther* v. *Borden,* 7 How. 45, 46. *Wilkes* v. *Dinsman,* 7 How. 89 ; S. C. *nom. Dinsman* v. *Wilkes,* 12 How. 403, 404. *Dynes* v. *Hoover,* 20 How. 82. Least of all, will the common law undertake to rejudge acts done *flagrante bello* in the face of the enemy. *In republicâ maxime conservanda*

*sunt jura belli.* Co. Litt. 11 *b.* 4 Inst. 123, 129. Petition of Right, 3 Car. I. *c.* 1, § 7. Debates of the Commons on Martial Law, 4 Car. I., 2 Rushworth's Hist. Coll. Appendix, 78–81. *Barwis* v. *Keppel*, 2 Wils. 314. *Johnstone* v. *Sutton*, 1 T. R. 546, 548, 549. *Warden* v. *Bailey*, 4 Taunt. 70.

But for a malicious exercise by a military officer of lawful authority; *Wall* v. *M'Namara*, cited in 1 T. R. 502, 536; *Governor Wall's case*, 28 Howell's State Trials, 144, 176; *Luther* v. *Borden*, 7 How. 46; *Dinsman* v. *Wilkes*, 12 How. 403–405; or for acts of a military officer or court, in excess of authority, though done in good faith, toward those in the military service, and *a fortiori* toward those who are not, where the civil laws are in full force, the person injured may obtain redress in the ordinary way, by suit against the wrongdoer. *Frye* v. *Ogle*, reported in the London Magazine for 1746, pp. 124, 125, 576, 577; stated in Prendergast's Law of Army Officers, 130–132, and in 1 McArthur on Courts Martial, 229, 344; and cited in 4 Taunt. 76, 87. *Comyn* v. *Sabine*, cited in Cowp. 169, 175, 176. *Swinton* v. *Molloy*, cited in 1 T. R. 537. *Warden* v. *Bailey*, 4 Taunt. 67; reversed in *Bailey* v. *Warden*, 4 M. & S. 400, only on the ground that the act complained of was in one view within the scope of the defendant's military authority. *Wolton* v. *Gavin*, 16 Q. B. 52, 62, 70, 79. *Wise* v. *Withers*, 3 Cranch, 337. *Ex parte Watkins*, 3 Pet. 208. *Dynes* v. *Hoover*, 20 How. 80, 81. *Fisher* v. *McGirr*, 1 Gray, 45. Massachusetts Declaration of Rights, art. 28. *Wilson* v. *Mackenzie*, 7 Hill, (N. Y.) 95. In the words of Lord Chief Justice Wilmot, " If a man be treated as a soldier, who is not duly listed or subject to military discipline, he has his action." Wilmot, 85, 86, *note.*

Was the plaintiff, then, at the time of the acts of which he complains, a soldier ? The words " enlist " and " enlistment," in the law, as in common usage, may signify either the complete fact of entering into the military service, or the first step taken by the recruit towards that end. If this ambiguity is not borne in mind, the consideration of this matter may degenerate into a dispute about words. The question before us is no ordinary one of the force, construction or validity of a contract —

whether the plaintiff has made an agreement and broken it, and is liable in damages for the breach; but of a change of *status* — whether by signing a particular paper, or by any other act, the plaintiff has changed his condition, given up some of the rights of a private citizen, and become amenable to military discipline. It becomes necessary, therefore, to ascertain the boundary between the civil and military states, and to inquire what acts, by the principles of the common law or the American constitutions, or by express provision of statute, are required to change. a citizen into a soldier. By tracing the history of the mode of enlisting soldiers under the law of England, out of which our law grew, we shall be enabled more satisfactorily to answer this question.

In the reigns of Edward I. and Edward II., soldiers for foreign wars were obtained for the most part, either by calling out the king's feudal tenants by knight· service, or by compulsory levies under a claim of prerogative. But the feudal service could not be required for more than forty days out of the realm, and was thus useless for prolonged wars upon the continent; and compulsory levies without consent of parliament were forbidden, as contrary to the common law, by the *Sts.* of 1 Edw. III., *St.* 2, c. 5, and 25 Edw. III., *St.* 5, c. 8. Edward III., therefore, during his wars with France, raised most of his armies under a system which had been introduced in some degree in the reign of Edward I., and continued in use until that of Henry VIII., by which nobles, knights or military leaders covenanted with the king to serve him in war for such a time with so many men, whose wages they received from the king, and who covenanted in turn with their leaders and received their wages from them, and were mustered before the king's commissioners, and their names recorded. 1 Rot. Parl. 163 *b*, 164 *a*. 2 Ib. 62 *b*, 63 *a*, 108 *b*, 329 *a*. Cotton Ab. Rec. 10, 11, 24, 35, 439, 440. *St.* 5 Rich. II., *St.* 1, c. 10. 3 Selden's Works, 1957. Co. Litt. 68*b*–71*a*, and Hargrave's notes. 2 Inst. 528, 529. 3 Inst. 86. 1 Hale P. C. 672, 673, 677. 1 Hallam's Middle Ages, c. 2, part 2, (10th ed.) 260–265. 2 Hallam's Const. Hist. Eng c. 9, (7th ed.) 129–133.

By the law of England during the same period, upon certifi-
cate of a captain that any of his soldiers, after receiving wages
of the king through him for foreign military service, would not
go, writs issued out of chancery to the sheriffs or to sergeants
at arms to arrest such soldiers and bring them into the chancery
or before the king in council.   See in the Register the writ *De
arrestando ipsum qui pecuniam recepit ad proficiscendum in obse-
quium regis et non est profectus,* and the writ *Ad capiendum con-
ductos ad proficiscendum in obsequium, qui captis vadiis ad dic-
tum obsequium venire non curaverint.* Reg. Brev. 24, 191.   "And
this," says Lord Coke, in his commentary on Magna Charta,
" is *lex terræ,* by process of law, *pro defensione regis et regni.*"
2 Inst. 53.   Both of these writs were founded upon the soldier's
having once actually submitted himself to his military leader,
and alleged that he had received from his leader the king's
money.   The statement, therefore, of Lord Coke, in his Fourth
Institute, that the writ *Ad capiendum conductos ad proficiscen-
dum* lies by the common law " if any soldier have covenanted to
serve the king in his war, and appear not at the time and place
appointed," which at first sight might seem to imply that receipt
of wages was unnecessary to fix the military character, must on
the contrary be deemed to assume the payment of money as
essential to bind the contract.   4 Inst. 128, 129.

The practice of enlisting soldiers in this manner was recog-
nized, and the departure from their captains, without license from
them, of soldiers who had thus received part of their wages, " and
so have mustered and been entered of record the king's soldiers
before his commissioners, for such terms for which their masters
have indented," declared felony, by *St.* 18 Hen. VI. *c.* 19.   The
*St.* of 7 Hen. VII. *c.* 1, extended this to " any soldier, being no
captain immediately retained with the king, which hereafter
shall be in wages and retained, or take any prest, to serve the
king upon the sea, or upon the land beyond the sea," to which
the *St.* of 3 Hen. VIII. *c.* 5, § 2, by inserting " or " between
" land " and " beyond," added within the realm ; and also sub-
stituted " license of the king's lieutenant there " for that of the
captain of the soldiers. *Resolves concerning Soldiers,* Hutton.

135.   The *St.* of 18 Hen. VI. was declared by *St.* 5 Eliz. *c.* 5, § 18, (or § 27,) to extend to all mariners and gunners "having taken prest or wages" to serve the crown upon the sea. All these statutes required actual receipt of money by the soldiers, as well as departure from their captains, to constitute desertion. But the *St.* of 2 & 3 Edw. VI. *c.* 2, (repealed by *St.* 1 Mary, *c.* 1, and revived by *St.* 4 & 5 P. & M. *c.* 3,) punished desertion by any soldier "serving the king in his wars."

In the reign of Elizabeth, after the mode of raising soldiers through indenture with their captains had fallen into disuse, all the judges of England held that the *St.* of Edw. VI. applied only to soldiers who had served in actual war; but that soldiers who had been pressed (*prest*, in the original Law French) and taken wages to serve against the Irish rebels, and were on the way towards Ireland, and, before they actually served in the war, departed from their captains without license, were guilty of felony under the *Sts.* of Hen. VII. and Hen. VIII.; and according to this opinion many soldiers were condemned and executed. *Case of Soldiers*, 2 Anderson, 151; S. C. 6 Co. 27 *a.*

It appears from these reports that the soldiers in question had been impressed to serve. Lord Hale was of opinion that *prest*, as applied in these statutes to the money received, did not necessarily imply that the service was compulsory; but that "in truth it was imprest money, *præstitium*, or the earnest of the contract between the king by the captain and soldiers." 1 Hale P. C. 675, 677. And he was clear that, in order to make a felony under the *Sts.* of Hen. VII., Hen. VIII. and Eliz., it must be alleged and proved, "1. That either they received wages, or took *prest* to serve the king upon sea or land; 2. That he that thus *imprested* them was commissioned by the king so to imprest them." Ib. 679. In those times, much weight was given to the payment of part of the consideration money of any agreement by way of earnest to bind the bargain, a vestige of which is still found in the provision of the statute of frauds concerning the sale of goods of considerable value without a written memorandum, which has come down to us from the

English statute passed in the reign of Charles II., in the fram-
ing of which Lord Hale is said to have taken part.

The decision of the judges in the reign of Elizabeth upon
the statutes of soldiers is further explained by an opinion given
by their successors to Charles I. upon the question whether sol-
diers were guilty of felony under the *Sts.* of Hen. VII. and
Hen. VIII., who had taken pay, and (as stated in the report by
one of the judges) been enrolled, or (as another has it) made
an agreement with the deputy lieutenant that a certain con-
ductor should lead them to the place of rendezvous, and were
accordingly delivered to the conductor to be brought to the sea
side, and then withdrew themselves and ran away without
license. A majority of the judges (Hutton, Croke and Yelver-
ton, dissenting) were of opinion that such a conductor, although
holding no military rank, was a captain within these statutes.
It may well be doubted whether this was not too harsh a con-
struction; and the opinion of the judges of that reign in favor
of the crown against the subject is not of the highest authority
especially with such a weighty dissent. But the deputy lieu-
tenant here mentioned was "the king's lieutenant" mentioned
in the *St.* of Hen. VIII. above cited, perhaps the lord lieuten-
ant of the county, in either aspect a purely military officer. 2
Hallam's Const. Hist. Eng. *c.* 9, (7th ed.) 134. And even those
twelve judges "unanimously agreed, that if one takes press
money, and when he should be delivered over he withdraw him-
self, this is not felony, although he is hired and retained to
serve." *Resolves concerning Soldiers*, Hutton, 134 ; S. C. Cro.
Car. 71. This opinion puts it beyond doubt that soldiers must
have both received money and come under actual command of
a leader, to warrant their punishment as deserters under those
statutes. And Judge Jenkins says, "It seems that these stat-
utes are only a declaration of the common law." Jenk. 271.

As lately as the reign of Charles II., the greatest lawyers in
England overlooked the distinction between martial and military
law — between the military rule, not limited to the army, which
prevails in time of war, when the civil laws have lost their force,
and the military discipline, necessary to the government of an

army at all times; and punishment by military authority in time of peace, even of the king's soldiers, was hardly allowed. 1 Hale's Hist. Com. Law, (5th ed.) 54, 56. *Ekins* v. *Newman,* T. Jones, 147. James II. indeed established articles of war for the government of his troops. 14 Law Mag. 4. But he was obliged to resort to the courts of law and the statutes already cited for the punishment of deserters; and this at a time when he could and did arbitrarily remove half of the judges of the king's bench for refusing to order a deserter thus convicted in one county to be illegally executed in another. *The King* v. *Beal,* 3 Mod. 124; S. C. *nom. The King* v. *Dale,* 2 Show. 511; S. C. 12 Howell's State Trials, 262, *note.*

After the accession of William and Mary, a standing army being found necessary, parliament retained the control of it by establishing it for only a year at a time; and these annual acts first made mutiny and desertion punishable at the sentence of a court martial in time of peace, and are therefore known as the Mutiny Acts. The earliest of these was limited to persons " being in their majesties' service in the army, and being mustered and in pay as an officer or soldier." *St.* 1 W. & M. *c.* 5, § 2. This clause was reënacted in the same form, thus requiring both mustering and pay to constitute the military character, until early in the following reign, when either was made sufficient, and the act extended to " every person being in her majesty's service in the army, or mustered or in pay as an officer, or listed or in pay as a soldier." *Sts.* 6 Anne, *c.* 18, (often cited as 5 & 6 Anne, *c.* 16,) § 2; 7 Anne, *c.* 4. But within five years after the passage of the first mutiny act, a section was inserted providing that no person should be " esteemed a listed soldier, or be subject to any of the pains or penalties of this act, or any other penalty for his behavior as a soldier," unless he should before a civil magistrate " declare his free consent to be listed or mustered as a soldier, before he should be listed or mustered or inserted on any muster roll of a regiment, troop or company." *St.* 5 & 6 W. & M. *c.* 15, § 2. And the law of England has since by similar provisions required either enlistment by a military officer, with full opportunity to reconsider and retract, in the

case of a soldier, or actually being mustered or commissioned in the case of an officer, to subject either to military discipline; allowing however the alternative of being in pay to avoid the necessity of discussing the nature of the engagement or mode of contracting it. See *Methuen* v. *Martin*, Sayer, 107; *Grant* v. *Gould*, 2 H. Bl. 103, 104; 1 McArthur on Courts Martial, 195, 196; *Bradley* v. *Arthur*, 4 B. & C. 308; *Wolton* v. *Gavin*, 16 Q. B. 48; Thomson's Military Forces of Great Britain, 92, *& seq.* That the original enlistment of a recruit, or payment of money to him, must be made by some person having the necessary military authority, in order to justify forcibly restraining him, is shown by the case in which a drummer, who had no lawful power to enlist recruits, upon being urged by a man to enlist him, gave him a shilling for that purpose; the man afterwards attempted to escape, and was opposed by the drummer and a private soldier with him, and the latter stabbed one who was assisting the escape; and the twelve judges held that he was liable to indictment for wilful stabbing. *Rex* v. *Longden*, Russ. & Ry. 228.

The articles of war, reported by a committee of which Adams and Jefferson were members, and established by the congress of the Confederation in 1776, within three months after the Declaration of American Independence, substantially adopted the provisions of the English mutiny acts; and required every recruit to be enlisted by a military officer and taken before a civil magistrate and there have the articles of war read to him and take the oath of allegiance and service; yet allowed the receipt of pay from the government to be conclusive evidence of enlistment; and declared that " all officers and soldiers who, having received pay, or having been duly enlisted in the service of the United States, shall be convicted of having deserted the same, shall suffer death or such other punishment as by sentence of a court martial shall be inflicted;" and that these articles " are to be read every two months at the head of every regiment, troop or company, mustered or to be mustered in the service of the United States; and are to be duly observed and exactly obeyed by all officers and soldiers who are or shall be in the said

service." Articles of War of September 20, 1776, § 3, art. 1; § 6, art. 1; § 18, art. 1; 2 Journals of Congress, 367, 369, 380. 3 John Adams's Works, 83, 84.

After all powers of war and peace had been granted by the Constitution to the national government, the Congress of the United States established similar articles. U. S. St. 1806, *c.* 20, arts. 10, 20, 101, 2 U. S. Sts. at Large, 361, 362, 371. The oath was permitted, by the *St.* of 1806, to be taken before the judge advocate, and by the *St.* of 1861, *c.* 42, § 11, before any commissioned officer of the army. 12 U. S. Sts. at Large, 289. Taking the recruit before the civil magistrate is thus dispensed with, but his engagement with a military officer is essential.

It was argued that the tenth article of war, which provides that " every non-commissioned officer or soldier who shall enlist himself in the service of the United States," shall have the articles of war read and the oath administered to him, shows that the oath can be administered to none but soldiers, and therefore the recruit must be a soldier before the oath could be administered to him. But it might equally well be contended that the use of the words " every soldier who shall enlist himself," instead of " shall have enlisted himself," shows that he must be a soldier before he enlists. The description of the recruit as a " non-commissioned officer or soldier " in this article is not intended to denote what he is already, but what he will be when his enlistment is complete.

A statute was passed near the close of the last war with England, authorizing recruiting officers of the army to enlist any one between the ages of eighteen and fifty years, " which enlistment shall be absolute and binding upon all persons under the age of twenty-one years as well as upon persons of full age, such recruiting officers having complied with all the regulations of the law regulating the recruiting service." U. S. St. 1814, sess. 3, *c.* 10, 3 U. S. Sts. at Large, 146. That statute did not undertake to fix what should constitute an enlistment, but referred for that to the previous laws. The object of the provision just quoted was simply to enable minors to be held like persons of full age; and the statute has always been considered as having

been repealed by the act passed at the same session, fixing the military peace establishment of the United States. U. S. St. 1815, *c.* 79, Ib. 225. *Ex parte Kimball,* 9 Law Reporter, 502, 503.

In addition to the power to raise, support and regulate armies congress is vested by the Constitution with authority to provide for organizing, arming and disciplining the militia, for calling them into the service of the United States to execute the laws of the Union, to suppress insurrections and repel invasions, and for governing them when employed in the national service. Under this power to organize, congress has the exclusive power of determining who shall constitute the militia ; and all persons coming within the class defined by congress are members of the militia, without any act of their own. *Opinion of Justices,* 14 Gray, 614. *Commonwealth* v. *Cushing,* 11 Mass. 71. *Whitmore* v. *Sanborn,* 8 Greenl. 310. U. S. St. 1862, *c.* 201, 12 U. S. Sts at Large, 597. Signing an enlistment list is not required to make them militia, and does no more than ascertain the particular company in which they shall serve, and perhaps estop the signers to claim exemption afterwards. Decisions or statutes, like those cited by the defendants, that such a signing is evidence of enlistment in a volunteer militia company, have therefore no bearing upon the question of what constitutes a soldier of the United States. *Bullen* v. *Baker,* 8 Greenl. 391 Gen. Sts. *c.* 13, § 18.

A nearer analogy may be found in the entry of the militia into the service of the Union, when called out by congress. This is well settled by the decisions of the supreme court of the United States to be upon their arrival at the place of rendezvous, and not before. *Houston* v. *Moore,* 5 Wheat. 20, 36, 53, 61. *Martin* v. *Mott,* 12 Wheat. 15. Some of the reasons given by the justices apply with great force to the case before us. " The arrival of the militia at the place of rendezvous," said Mr. Justice Washington, " is the *terminus a quo* the service, the pay, and subjection to the articles of war are to commence and continue. If the service, in particular, is to continue for a certain length of time from a certain day, it would seem to follow, almost conclusively,

that the service commenced on that, and not on some prior day." 5 Wheat. 20. Mr. Justice Story added, " It would seem almost absurd to say that those men, who have performed no actual service, are yet to receive pay; that they are ' employed,' when they refuse to be employed in the public service ; that they are ' acting ' in conjunction with the regular forces or otherwise, when they are not embodied to act at all; or that they are subject to the articles of war as troops organized and employed in the public service, when they have utterly disclaimed all military organization and obedience. There are the strongest reasons to believe that by employment ' in the service,' or, as it is sometimes expressed, ' in the actual service' of the United States, something more must be done than a mere calling forth of the militia ; that it includes some act of organization, mustering or marching, done or recognized." Ib. 63.

Attorney General Legaré, in an opinion to the secretary of war in 1841, on the payment of the Florida militia, expressed like views, saying, " It is only when called out into actual service that the militia are subjected to the exclusive control of the federal authorities. Until detachments from it have been actually mustered, to be subjected in a solemn and authentic form to the articles of war, as in the parallel case of voluntary enlistment, the body of the people, armed and disciplined in self defence, (for that is the definition of the militia,) stand in all respects upon the same footing as in any other of their great political relations. Nor will anything short of this formal dedication, so to express it, of portions of it to military responsibilities, and actual embodying of them into masses, under the rules and regulations of war, constitute them a part of the federal army." 3 Opinions of Attorneys General, 691.

The standing army of the United States has always been inconsiderable in number, and the policy of the government has not favored sudden increase and decrease of the regular forces. The power of calling out the militia has been exercised for short periods, both in order to avoid unnecessarily disturbing the usual occupations of the citizens, and because the militia were unfitted for long service. Congress, therefore, whenever

there has been need of an unusually large military force, has resorted to an intermediate method of obtaining soldiers, by au thorizing the president to accept the services of volunteers, either for a particular war, or for a period estimated by the probable duration of hostilities. The government thus appeals directly to the patriotism of the people, relying upon the fundamental principle of society, the mutual obligation of protection and support, which is expressed in the simplest words and the closest connection in our own Declaration of Rights. " Each indi- vidual of the society has a right to be protected by it in the enjoyment of life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection ; to give his personal service, or an equivalent, when necessary." Declaration of Rights, art. 10.

In providing for calling out volunteers, congress has usually lodged the appointment of officers of the regiments and com- panies, where the Constitution left the appointment of militia officers, with the States. One exception to this course is to be found during the last war with England, when congress at first authorized the president to accept of " companies of volunteers, either of artillery, cavalry or infantry, who may associate them- selves for the service," who should be armed and equipped at the expense of the United States " after they shall be called into the service," and their officers appointed according to state laws ; and who should be bound to continue in the service for the term of twelve months after they should " arrive at the place of rendezvous, unless sooner discharged ; and, when called into the service and while remaining there," should be under the same rules and regulations and be entitled to the same pay as the regular troops of the United States. U. S. St. 1812, *c.* 21, 2 U. S. Sts. at Large, 676. Six months afterwards congress by a supplemental act provided that the president might appoint and commission the officers, " provided that prior to the issuing of such commissions the volunteers aforesaid shall have signed an enrolment binding themselves to service, conformably to the provisions of the act to which this is a supplement." U. S. St. 1812, *c.* 138, Ib. 785. But there is nothing in that act to show

that those volunteers, before they had assembled at the place of rendezvous, or the officers appointed by the president had assumed command of them, were to be treated as soldiers subject to military discipline.

During the war with Mexico the president was authorized to accept the services of volunteers, " to serve twelve months after they shall have arrived at the place of rendezvous, or to the end of the war, unless sooner discharged, according to the time for which they shall have been mustered into the service," who, " when mustered into the service, shall be armed at the expense of the United States," and, " when called into actual service, and while remaining therein, be subject to the rules and articles of war," and be accepted by the president in companies, battalions, squadrons or regiments, with officers appointed according to the laws of the states.　The same act provided that " whenever the militia or volunteers are called and received into the service of the United States, under the provisions of this act, they shall have the same pay and allowances."　U. S. St. 1846, *c.* 16, 9 U. S. Sts. at Large, 9, 10.　And congress afterwards made provision for refunding to " states, counties, corporations, or individuals, either acting with or without the authority of any state," the amount of any necessary or proper expenses incurred in organizing, subsisting and transporting volunteers, " previous to their being mustered and received into the service of the United States during the present war."　U. S. St. 1848, *c.* 60. Ib. 236.

Upon the breaking out of the existing rebellion, the president summoned congress together, and called out the militia first, and then volunteers to serve for a period of three years, unless sooner discharged, and " to be mustered into the service as infantry and cavalry."　Proclamations of April 15th and May 3d, 1861, 12 U. S. Sts. at Large, Appendix.　Congress, upon assembling, ratified the acts of the president; authorized him to accept the services of volunteers, for any time not exceeding three years nor less than six months, in such numbers from each state as he might determine, and to form them into regiments, the officers of which should be appointed by the governors of the

States; and enacted that these volunteers should be "mustered into the service for three years" or "during the war," be subject to the rules and regulations governing the army of the United States, and be upon the same footing in all respects with similar corps of the regular army. U. S. Sts. 1861, *cc*. 9, 17, 34, Ib. 268, 274, 279. Provision was also made for the payment of "all volunteers mustered into the service of the United States," from the time of their organization and acceptance as companies by the governors of the states. U. S. Sts. 1861, *cc*. 16, 63. Ib. 274, 326.

By an act of February 13th 1862, "no person under the age of eighteen shall be mustered into the United States service;" and "no volunteers or militia from any state or territory shall be mustered into the service of the United States on any terms or conditions confining their service to the limits of said state or territory," with certain exceptions in Maryland and Missouri. U. S. St. 1862, *c*. 25, §§ 2, 3. Ib. 339.

On the 21st of June 1862, congress resolved that "every soldier who hereafter enlists, either in the regular army or the volunteers, for three years or during the war, may receive his first month's pay in advance, upon the mustering of his company into the service of the United States, or after he shall have been mustered into and joined a regiment already in the service." U. S. Res. 37. Ib. 620. The order of the war department under this resolution, together with a like order offering payment of a portion of the bounty allowed by law "upon the mustering of the regiment to which such recruits belong into the service of the United States," were set forth in the governor's proclamation of July 2d 1862, which is annexed to the bill of exceptions.

By the army regulations, "when volunteers are to be mustered into the service of the United States, they will at the same time be minutely examined by the surgeon and assistant surgeon of the regiment;" and "no volunteer will be mustered into the service who is unable to speak the English language." Revised Army Regulations of 1861, §§ 1666, 1670.

All these acts of the national legislature and executive look to the mustering of the volunteers into the service of the United

States as the beginning of their military condition. Some of them use, as synonymous with " mustered," the words " received into the service," or " called into service," which last, as applied to the similar case of militia, had received the highest judicial exposition in the case of *Houston* v. *Moore,* above cited. There are many later public acts to the same effect. But we have confined our citations to those preceding the call of July 1862, under which the defendants acted.

It was argued, upon the etymological derivation of the word " muster " from the Latin *monstrare,* " to show," that " mustering " was only showing that the persons mustered were at the time of the muster in the service, and that " mustering into the service " was only the first time they were mustered after being in the service. But although the word " muster " by itself may doubtless be applied to a parade of soldiers already enrolled, armed and trained, the addition of the preposition of motion removes all ambiguity, and " mustering into the service," or " mustering in," clearly implies that the persons mustered are not already in the service.

The action of the selectmen of Washington toward the plaintiff was founded on an entire misapprehension of the nature of their powers and duties. The appeal of the president was made through the governor of Massachusetts, as the chief executive authority of the Commonwealth, for its quota or proportion of men, the mode of raising which was left to him. He proceeded to organize a system by which the patriotism of the people might promptly and effectively meet the president's call. But that call was for volunteers, and to be responded to voluntarily. The president commissioned no military officers to obtain recruits ; the militia organization of the State was unsuitable, as had in fact been assumed in the very call for volunteers ; and new regiments were needed, of which no officers had yet been appointed, as well as men to fill up the ranks of old regiments. The whole Commonwealth had long been divided into cities and towns, the officers of which, chosen annually by the people, were well known and trusted by them. To these officers the governor appealed. They held no military commission,

they were subject to no military discipline, and clothed with
no military authority.  They were called upon simply as rep·
resentatives of their fellow-citizens, to excite and assist them in
the performance of the patriotic duty of uniting in the active
support of the government of the country.  They were to ex-
plain to them the nature of the service to be undertaken, obtain
their promises to engage therein, show them the way to the ren·
dezvous, and pay their expenses thither.

A more particular examination of the orders of the governor,
introduced in evidence at the trial, shows his action to have
been in exact accordance with this view.  On the 2d of July,
the day of the publication of the president's call, the governor
proclaimed to the people of Massachusetts the president's " de-
sire and readiness to receive a large accession to the volunteer
military force now in the field," both by filling up existing corps,
and by new regiments ; and gave notice of the advance pay and
bounties which recruits would receive upon the mustering of
their companies or regiments into the service of the United
States, or upon joining regiments already in the service, and
of the premium to be paid to any person for each accepted
recruit brought to the rendezvous.  On the 7th of July he
published a table of the proportions due from each city and
town, according to the number of enrolled men liable to mili-
tary duty ; and " urgently requested mayors of cities and select-
men of towns to exercise their official and personal influence to
furnish their quotas."  A week later he issued to the selectmen
a certificate of their authority to enlist a number of men equal
to their quota ;  and immediately afterwards issued detailed
instructions, " respectfully asking the coöperation of all municipal
officers in this duty," advising them to accept no man incompe-
tent for military service, and directing them to " forward " the
recruits in squads to the camps of rendezvous, with directions
to report to the general receiving officer there.  His orders con-
tain no express words empowering the municipal authorities to
exercise force over the recruits ; and such a power cannot be
implied.  They were not authorized to compel or even com-
mand the recruits to proceed to the rendezvous.  They had no

authority to pay any money to recruits, to administer any oath, to perform any ceremony of mustering, or to require any obedience. That the enlistment of the recruits was not considered yet complete is shown by the direction to send with each squad a list, (which might be by the hand of any civil officer or private citizen, or even of one of the very recruits,) signifying " the corps into which each proposes to enlist." And it was only after arriving at the rendezvous, and being examined by a surgeon, that the recruits were to be mustered into the service. Those rejected by the surgeon were to be returned to their municipality, and not allowed as a part of its quota. Clothing, equipment and subsistence were first provided for the recruits after being mus- tered in. There was no authority to pay them any wages, bounty or earnest money before that time. Only the expenses of transportation to the rendezvous were reimbursed to the municipal officers. Such was the whole extent of the orders under which the selectmen of the town of Washington acted in enlist- ing the plaintiff. They clearly conferred no authority upon the defendants to compel the plaintiff to take a single step toward becoming a soldier against his consent.

An examination of the position in which the plaintiff stood leads to the same conclusion. Congress had authorized the enlistment of volunteers for no longer term than three years. U. S. St. 1861, *c.* 9. The only act done by the plaintiff toward entering the service was to sign an agreement " to serve for a period of three years from the date of being mustered into the service, in accordance with the act" just referred to. He never agreed to enter the service or become a soldier immediately. He never submitted himself to, nor contracted any engagement with, any military officer. He never received any money from any officer, military or civil, of the state or nation, nor any rations, uniform, arms or equipments. He never was examined by a sur- geon, nor took any oath, nor was mustered into the service. And he never actually served as a soldier. But when called upon by the selectmen to go to the rendezvous, he absolutely refused to do so, and was by them forcibly taken to the camp of rendez- vous and delivered to the commandant, who imprisoned him in

the guard tent for some days ; and immediately upon being released he brought this action against the selectmen and their assistants to recover damages for his arrest and imprisonment.

After the fullest consideration, we are unanimous in the opinion that the plaintiff was not a soldier, nor subject to any military authority or discipline as such.   The statutes and orders already cited seem to assume the mustering of a recruit into the service as the point at which the right to exercise military restraint over him is intended to begin.   We are not however prepared to say that actual submission as a soldier to a commissioned officer would not be of itself sufficient.   Still less would we be understood as intimating that a recruit of full age, who had actually served, or received money from the government, could be allowed to dispute the regularity or completeness of his enlistment.   But we can have no doubt that the mere signing of a paper in the hands of a municipal officer, containing a promise to serve from a future day, to be fixed only by the performance of a distinct act, is not sufficient to change the state of a citizen into that of a soldier.

In the cases of *Kimball, Murray and Stone,* 9 Law Reporter, 500, in which this court refused to discharge on *habeas corpus* minors who had enlisted with the consent of their parents in a company of the volunteer forces raised for the Mexican war, the petitioners had been mustered and received into the service of the United States ; and no question was raised of the completeness of the enlistment.

The case of *Dew,* 25 Law Reporter, 538, does not help the defendants.   In that case Mr. Justice Merrick decided that a minor who had not only enlisted, but also, as the report states, drawn rations and clothing and done duty as a soldier, could not be taken by writ of *habeas corpus* out of the custody of a military officer holding him to await the result of a court martial upon charges filed against him for a military offence committed while in the service.   Of the correctness of that decision we have no doubt.   It rests upon the principle that where two governments have jurisdiction over the same territory, a person held for trial by the courts of the one cannot be taken

out of their custody by the courts of the other. But it has no tendency to show that if the petitioner in that case had neither received any pay, rations or clothing, nor submitted to any military officer, nor done any military duty, nor committed any military offence, military authority could have been exercised over him by virtue of the simple signing of a contract of enlistment, even if he had been of full age.

Our judgment in the case at bar corresponds with the decision of Judge Sprague — and there is no judge whose opinion upon such a question has greater weight — in a case recently tried in the district court of the United States, under the act of Congress of 1855, *c.* 136, § 11, punishing the enticing of any seaman, "who may have enlisted into the naval service of the United States," to desert therefrom. A seaman had been examined by a surgeon and passed through all the necessary steps at the naval rendezvous in Boston, signed shipping articles which stated the date and term of his enlistment, and received orders to go on board the receiving ship and for his advance pay ; but, on reaching the ship, was found to be so intoxicated that the commanding officer, in accordance with the instructions of the navy department, declined to receive him until he should become sober ; and he then left the ship, promising to return the next morning, but was meanwhile enticed away by the defendant. He was held not to be an " enlisted seaman," because he had done no duty, had been paid no money, and was not entitled by the regulations of the navy department to any pay until after being passed on the receiving ship. 10 U. S. Sts. at Large, 628. *United States* v. *Thompson*, 27 Law Reporter, . See also *Bamfield* v. *Abbot*, in the same court, 9 Law Reporter, 510.

As the plaintiff was not a soldier, he could not of course be a deserter. There is therefore no occasion to examine the extent of the authority claimed by the defendants under the instructions from the acting provost marshal of the Commonwealth for the arrest of deserters from the military service of the United States.

It was argued for the defendants that the plaintiff, if not a soldier of the United States, had become, by signing the enlistment

paper, a soldier of the Commonwealth of Massachusetts, bound to do all acts in his power to place himself in a condition to be mustered into the service of the United States, and to this end to obey the order of the selectmen to report himself at a camp of rendezvous, and was rightly arrested by the defendants for disobedience of such an order. But the court can see no ground for this position. The selectmen had no military authority, either as state or as national officers, and no legal right to make such an order. The plaintiff never made any agreement to become a soldier of the Commonwealth. He was not called out as one of the militia, nor is there any evidence that either of those who restrained him of his liberty was a militia officer. The provisions of the Gen. Sts. *c.* 13, to which the defendants have referred upon this point, relate solely to the militia in the service of the Commonwealth, not to volunteers called out by congress to increase the army of the Union. *Ex parte Kimball,* 9 Law Reporter, 503. *Bamfield* v. *Abbot,* Ib. 510.

The plaintiff not being a soldier nor subject to military discipline, the justification of the defendants fails, and they are liable in this action. It only remains for us to examine the rulings of the presiding judge upon the admission and exclusion of evidence, and the measure of damages.

The bill of exceptions does not show that the plaintiff at the trial offered any evidence of malice or ill will on the part of the defendants toward him. It is therefore unnecessary to consider how far such evidence, if introduced, could have been rebutted by evidence of good faith.

The vote of the town could give no validity to the action of its selectmen in arresting the plaintiff. By the well settled law of the Commonwealth, towns in their corporate capacity have no power to raise soldiers, nor to do any act or vote any money on that subject, without authority of the legislature. *Stetson* v. *Kempton,* 13 Mass. 280. *Hunnewell, petitioner,* 9 Law Reporter, 506. *Fowler* v. *Selectmen of Danvers, ante,* 80.

The fact that other recruits, who signed the same enlistment paper as the plaintiff, reported at the camp of rendezvous and were received into the service of the United States, had no

tendency to prove that he was in that service before he had reported or been received there.

The acts and declarations of the plaintiff in the meetings held for the purpose of raising the quota of the town were offered, as the bill of exceptions states, " to show that, by sign-.ng the said roll, he intended to place himself in the military service of the United States, and also in reduction of damages." But intention will not make a man a soldier, unless accompanied or followed by the acts necessary to constitute a change of his state from civil to military. The question before us is not what he intended to do, but how much he actually had done, how far his intention had been carried out, when the defendants assumed to exercise military authority over him. If he was not then a soldier, his previous expressions of an intention to become one, or even his supposition that he was, would not make him one. The fact of his having received back the money deposited under his agreement with Higgins could not estop him to deny that his enlistment was complete; nor was the opinion of Higgins, or of the stakeholder, upon that question, of any greater weight than his own. We do not understand that the defendants now insist upon the admissions of the plaintiff, or his receipt of this money, in reduction of damages. They certainly furnish no evidence of which the defendants can avail themselves.

The questions which the defendants proposed to put to the adjutant general were rightly excluded as immaterial. Proof that the enlistment paper signed by the plaintiff was in the form commonly used in this commonwealth could not aid the defendants, without showing that the plaintiff had done some further act to make him a soldier. Testimony as to the usual mode of enlisting volunteers, or the actual holding in the service of persons enlisted on such papers, would have no bearing upon the question at what stage of the enlistment the right of forcible restraint begins, or by whom it may be exercised.

One of the issues raised by the answer and tried before the jury was whether the plaintiff was forcibly arrested by the defendants or went to the rendezvous of his own accord. Upon

that issue, and also to show the bias of the defendant Pomeroy as a witness, the evidence admitted to contradict his testimony on cross-examination was competent.  *Collins* v. *Stephenson*, 8 Gray, 438.

In an action of this nature, to recover damages for injuries caused by unlawful force intentionally exercised upon the plaintiff, the defendants are liable both for the bodily suffering, and for the injury to the plaintiff's feelings occasioned by the wrongful act.  *Stowe* v. *Heywood*, 7 Allen, 122, 123, and cases cited.

The only remaining exception is to the admission of evidence of the plaintiff's imprisonment in the guard tent at the rendezvous by order of the military commandant there, and to the instruction that the circumstances attending that imprisonment were admissible in evidence upon the question of damages. But such detention was a direct consequence, indeed an immediate continuation, of the unlawful arrest and imprisonment. The plaintiff, not being a soldier, was at perfect liberty to decline to become one, and guilty of no breach of military duty in so declining; and the defendants, not being military officers, can no more shelter themselves under a military subordination to the commandant of the camp than under a military authority over the plaintiff.  Neither that commandant, nor any of the defendants having any legal right to restrain the plaintiff by force, they were all trespassers, and the defendants were liable for all the consequences of their acts, including the imprisonment at the camp, as well as the previous arrest and detention.  This case is thus distinguished from that of *Ela* v. *Smith*, 5 Gray, 142, cited by the defendants.

The defendants relied on the case of *Lock* v. *Ashton*, 12 Q. B. 871, in which it was held that one who had been taken before a magistrate on a charge of felony, remanded by the magistrate, and afterwards discharged, could not in an action of trespass for false imprisonment against the person who gave him in custody, recover damages for the remand by the magistrate.  But in that case the magistrate acted in the discharge of his judicial duty.  On the other hand, a complainant who obtained a warrant from a magistrate having no jurisdiction,

and induced an officer to arrest the party complained of, was held by this court liable in damages to the party arrested. *Emery* v. *Hapgood*, 7 Gray, 55. So Lord Ellenborough held that a person who falsely and positively stated to the commander of a press gang that another person was liable to impressment as a seaman, in consequence of which the latter was impressed, was held liable to an action for the trespass and false imprisonment, without proof of malice. *Flewster* v. *Royle*, 1 Camp. 187. And in an action brought by a marine against the commander of a naval expedition for wrongful imprisonment, on board his ship, and also on shore in a fort of the local authorities at the Sandwich Islands, the supreme court of the United States held that the jury, if they found for the plaintiff, might take into consideration his imprisonment on shore, the situation and condition of the place, the character of the person by whose authority it was governed, and his food, clothing, and general treatment there. *Dinsman* v. *Wilkes*, 12 How. 405. These authorities fully support the right of the plaintiff in this action to recover damages for his whole imprisonment, both before and after he was brought to the camp of rendezvous.

There being no error in the rulings or instructions of the presiding judge upon any question raised at the trial, the plaintiff is entitled to judgment upon the verdict which the jury have rendered in his favor. *Exceptions overruled.*