MASSES PUB. CO. v. PATTEN, Postmaster.

(Circuit Court of Appeals, Second Circuit. November 2, 1917.)

No. 123.

1. POST OFFICE ⬥➡14—NONMAILABLE MATTER.
    Espionage Act June 15, 1917, c. 30, 40 Stat. 230, tit. 12, § 1, declaring every letter, newspaper, or other publication, matter, or thing in violation of any of the provisions of that act to be nonmailable, and section 2, declaring nonmailable every letter, newspaper, etc., containing any matter advocating or urging treason, insurrection, or forcible resistance to any law of the United States, excludes from the mails any letters or literature in furtherance of any acts prohibited under the other titles of the statute.

2. CONSTITUTIONAL LAW ⬥➡90—POST OFFICE ⬥➡14—NONMAILABLE MATTER— FREEDOM OF SPEECH AND OF PRESS.
    Espionage Act June 15, 1917, tit. 12, §§ 1, 2, declaring certain matter nonmailable, do not violate Const. Amend. 1, declaring that Congress shall make no law abridging the freedom of speech or of the press, as the statute imposes no restraint on the matter prior to publication, and no restraint afterwards except as it restricts circulation through the mails, and while liberty of circulating may be essential to freedom of the press, liberty of circulating through the mails is not essential, so long as transportation in any other way is not forbidden.

3. CONSTITUTIONAL LAW ⬥➡278(1)—DUE PROCESS OF LAW—EXCLUSION OF MATTERS FROM THE MAIL.
    Espionage Act, tit. 12, §§ 1, 2, declaring certain matter nonmailable, do not violate Const. Amend. 5, providing that no person shall be deprived of life, liberty, or property without due process of law, though by the exclusion of complainant's magazine from the mails its business was practically ruined.

4. CONSTITUTIONAL LAW ⬥➡70(3)—JUDICIAL FUNCTIONS—ENCROACHMENT ON LEGISLATURE.
    It is the function of the legislative department to enact law, and of the judicial department to construe and apply it; and the courts cannot pass upon the wisdom or justice of statutes, but are simply to ascertain the intent of the lawmakers as expressed therein and to give effect thereto.

⬥➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. POST OFFICE ☞14—NONMAILABLE MATTER.**

The Espionage Act is not intended to repress legitimate criticism of Congress or of the officers of the government, or to prevent any proper discussion looking to the repeal of any legislation which may have been enacted, but only to prevent the dissemination and distribution through the mails of publications intended to embarrass and defeat the government in the successful prosecution of the war.

**6. POST OFFICE ☞14—EXCLUSION OF MATTER FROM MAILS—REVIEW BY COURTS.**

The Postmaster General is to determine whether a particular publication is nonmailable under the Espionage Act, and in so determining is required to use judgment and discretion; and his decision is conclusive on the courts, unless clearly wrong.

**7. POST OFFICE ☞14—NONMAILABLE MATTER.**

Certain articles and cartoons, published by complainant in its magazine concerning the war, conscription, etc., *held* to warrant the Postmaster General's determination that it was nonmailable under the Espionage Act, as calculated and intended to obstruct recruiting or enlistment, in violation of title 1, § 3, but not unmailable, as advocating or urging treason, insurrection, or forcible resistance to any law of the United States, in violation of title 12, § 2.

**8. POST OFFICE ☞14—NONMAILABLE MATTER.**

A cartoon published by complainant in its magazine, representing the Liberty Bell in a broken form, whatever its meaning, did not by itself afford any ground for exclusion of the magazine from the mails.

**9. POST OFFICE ☞14—EXCLUSION OF MATTER FROM MAILS—INJUNCTION—BURDEN OF PROOF.**

Complainant, suing to enjoin the postmaster from excluding its magazine from the mail, pursuant to an order of the Postmaster General holding it nonmailable, had the burden of overcoming the presumption that the Postmaster General's conclusion was right, or of showing that he had exceeded his power, or exercised it wantonly or maliciously; and this should be done by a preponderance of evidence.

**10. POST OFFICE ☞14—NONMAILABLE MATTER.**

The Espionage Act excludes from the mails any publication, the natural and reasonable effect of which is to encourage resistance to a law of the United States, and the words of which are used in an endeavor to persuade to resistance, though the duty to resist is not mentioned directly, and the interest of the persons addressed in resistance is not directly suggested.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Masses Publishing Company against Thomas G. Patten, Postmaster of the City of New York. From an order ([D. C.] 244 Fed. 535) granting a temporary injunction, defendant appeals. Reversed.

This cause comes here on appeal from an interlocutory order granting a temporary injunction commanding the defendant to transmit a certain publication through the mails, which order was entered on July 26, 1917. Thereafter, and on August 4, 1917, the aforesaid order was stayed until the hearing and determination of the appeal taken by the defendant. 245 Fed. 102, —— C. C. A. ——.

Francis G. Caffey, U. S. Atty., of New York City, for appellant.
Gilbert E. Roe, of New York City, for appellee.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

ROGERS, Circuit Judge. The complainant seeks an injunction restraining the defendant, as postmaster of the city of New York, from treating the August issue of a magazine known as The Masses as nonmailable matter under the act of Congress of June 15, 1917, commonly known as the "Espionage Act," and commanding him to transmit the said magazine through the mail in the usual way.

Upon the filing of the complaint an order was entered requiring the defendant to show cause why the injunction should not issue. At the hearing affidavits were presented on behalf of the complainant to show that, if the magazines should be excluded from the mails, the business of the complainant would be practically ruined. An affidavit of the Postmaster General of the United States was presented on behalf of the defendant.

Under the provisions of Espionage Act, title 12, it became the official duty of the Postmaster General to determine what matter is nonmailable, and that official had instructed the postmaster of New York that The Masses was nonmailable. It appears that before this order was issued the solicitor for the department, the Attorney General of the United States, and the Judge Advocate General of the army, the later being a lawyer and charged with the administration of the Draft Act of May 18, 1917, were consulted, and that they each advised that the circulation of the issue in question would constitute an offense under the Espionage Act. And the Judge Advocate General informed the department that it was his opinion that the necessary effect of the issue of this August number would be to cause insubordination, disloyalty, mutiny, and refusal of duty in the naval and military forces of the United States, and that it would obstruct the recruiting and enlistment service of the United States. The learned District Judge, in a carefully prepared opinion, reached the conclusion that the August issue of the publication in question did not contain any illegal matter and that the injunction should issue.

That part of the Espionage Act which is involved here is title 12, which relates to the use of mails, and it reads as follows:

"Sec. 1. Every letter, writing, circular, postal card, picture, print, engraving, photograph, newspaper, pamphlet, book or other publication, matter or thing, of any kind, in violation of any of the provisions of this act is hereby declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier: Provided, that nothing in this act shall be so construed as to authorize any person other than an employé of the Dead Letter Office, duly authorized thereto or other person upon a search warrant authorized by law, to open any letter not addressed to himself.

"Sec. 2. Every letter, writing, circular, postal card, picture, print, engraving, photograph, newspaper, pamphlet, book, or other publication, matter or thing, of any kind, containing any matter advocating or urging treason, insurrection, or forcible resistance to any law of the United States, is hereby declared to be nonmailable."

Section 3 of title 12 relates to the punishment to be imposed upon any person who uses or attempts to use the mails for the transmis-

sion of any matter declared to be nonmailable, and is not involved in this proceeding. But, as section 1 of title 12 makes nonmailable any matter which is in violation of any of the provisions of the act, it will be necessary to consider section 3 of title 1, which reads as follows:

"Sec. 3. Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years or both."

[1] It is the clear intent of title 12 to close the United States mails to any letters or literature in furtherance of any acts prohibited under the other titles of the statute. It is said that the act violates the First Amendment to the Constitution, which declares that "Congress shall make no law * * * abridging the freedom of speech, or of the press." It is also said that the act violates the Fifth Amendment, which provided that "no person shall be * * * deprived of life, liberty, or property, without due process of law."

[2] In his Commentaries on the Laws of England Mr. Justice Blackstone in speaking of the liberty of the press declares that it is "essential to the nature of a free state." It consists, he says, "in laying no previous restraint upon publications, and not in freedom from censure for criminal matter when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity." Volume 4, p. 151. And Mr. Justice Story, in his Commentaries on the Constitution, states that "every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press." Volume 2, sec. 1884 (4th Ed.).

In Patterson v. Colorado, 205 U. S. 454, 462, 27 Sup. Ct. 556, 558, 51 L. Ed. 879, 10 Ann. Cas. 689 (1907), the court, speaking through Mr. Justice Holmes, declares that the main purpose of the constitutional provision as to free press is "to prevent all such previous 'restraints' upon publications as had been practiced by other governments," and they do "not prevent the subsequent punishment of such as may be deemed contrary to the public welfare." Now clearly the Espionage Act imposes no restraint prior to publication, and no restraint afterwards, except as it restricts circulation through the mails. Liberty of circulating may be essential to freedom of the press, but liberty of circulating through the mails is not, so long as its transportation in any other way as merchandise is not forbidden.

The Act of Congress now called in question does not undertake to say that certain matter shall not be published nor that it shall not be transmitted in interstate commerce. It simply declares that such matter shall not be carried in the United States mails. In Ex parte Jackson, 96 U. S. 727, 24 L. Ed. 877 (1877), the Supreme Court held that

the power vested in Congress to establish post offices and post roads embraces the regulation of the entire postal system of the country, and that under it Congress can designate what may be carried in the mail and what excluded. In that case Mr. Justice Field, speaking for the court, said:

"In excluding various articles from the mail, the object of Congress has not been to interfere with the freedom of the press, or with any other rights of the people, but to refuse its facilities for the distribution of matter deemed injurious to the public morals."

A conviction for depositing in the mail a lottery circular contrary to an act of Congress was sustained. And that decision was adhered to in Re Rapier, 143 U. S. 110, 134, 12 Sup. Ct. 374, 36 L. Ed. 93 (1892). In the latter case Mr. Chief Justice Fuller said:

"The circulation of newspapers is not prohibited, but the government declines itself to become an agent in the circulation of printed matter which it regards as injurious to the people. The freedom of communication is not abridged within the intent and meaning of the constitutional provision unless Congress is absolutely destitute of any discretion as to what shall or shall not be carried in the mails, and compelled arbitrarily to assist in the dissemination of matters condemned by its judgment, through the governmental agencies which it controls. That power may be abused furnishes no ground for a denial of its existence, if government is to be maintained at all."

In Public Clearing House v. Coyne, 194 U. S. 497, 24 Sup. Ct. 789, 48 L. Ed. 1092 (1904), the court had before it the constitutionality of a law which authorized the Postmaster General "upon evidence satisfactory to him," and which did not provide for any trial, hearing, or inquiry of any kind, to shut out of the mails the letters of any person or company conducting a lottery or any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses. Mr. Justice Brown, writing for the court, said:

"In establishing such [postal] system Congress may restrict its use to letters, and deny it to periodicals; * * * it may admit books to the mails and refuse to admit merchandise, or it may include all of these and fail to embrace within its regulations telegrams or large parcels of merchandise, although in most civilized countries of Europe these are also made a part of the postal service. It may also refuse to include in its mails such printed matter or merchandise as may seem objectionable to it upon the ground of public policy, as dangerous to its employés or injurious to other mail matter carried in the same packages. The postal regulations of this country, issued in pursuance of act of Congress, contain a long list of prohibited articles dangerous in their nature, or to other articles with which they may come in contact, such, for instance, as liquids, poisons, explosives and inflammable articles, fatty substances, or live or dead animals, and substances which exhale a bad odor. It has never been supposed that the exclusion of these articles denied to their owners any of their constitutional rights. While it may be assumed, for the purpose of this case, that Congress would have no right to extend to one the benefit of its postal service, and deny it to another person in the same class and standing in the same relation to the government, it does not follow that under its power to classify mailable matter, applying different rates of postage to different articles, and prohibiting some altogether it may not also classify the recipients of such matter, and forbid the delivery of letters to such persons or corporations as in its judgment are making use of the mails for the purpose of fraud or deception or the dissemination among its citizens of information of a character calculated to debauch the public

morality. For more than 30 years not only has the transmission of obscene matter been prohibited, but it has been made a crime, punishable by fine or imprisonment, for a person to deposit such matter in the mails. The constitutionality of this law we believe has never been attacked. The same provision was by the same act extended to letters and circulars connected with lotteries and gift enterprises, the constitutionality of which was upheld by this court in Re Rapier, 143 U. S. 110 [12 Sup. Ct. 374, 36 L. Ed. 93]."

[3] The court held that the fact that the Postmaster General could act and that no judicial hearing was provided for was not a fatal objection to the act. It declared:

"That due process of law does not necessarily require the interference of the judicial power as laid down in many cases and by many eminent writers upon the subject of constitutional limitations. * * * If the ordinary daily transactions of the departments, which involve an interference with private rights, were required to be submitted to the courts before action was finally taken, the result would entail practically a suspension of some of the most important functions of the government."

The opinion of Judge Cooley in Weimer v. Bunbury, 30 Mich. 201, is cited approvingly, in which he said:

"There is nothing in these words ('due process of law'), however, that necessarily implies that due process of law must be judicial process. Much of the process by means of which the government is carried on and the order of society maintained is purely executive or administrative. Temporary deprivations of liberty or property must often take place through the action of ministerial or executive officers or functionaries, or even of private parties, where it has never been supposed that the common law would afford redress."

This court holds, therefore, that the Espionage Act, in so far as it excludes from the mails certain matter declared to be unmailable, is constitutional.

The provisions contained in title 12 of the Espionage Act respecting the use of the mails do not abridge the freedom of the press, nor deprive the complainant of its property, within the meaning of the First and Fifth Amendments. Congress has not attempted to prevent the transportation of this publication as merchandise by the railways or by the express companies, and it has not authorized the confiscation of it, neither has it in any way prohibited publication.

In 1798 Congress enacted what is known as the Sedition Law. Act July 14, 1798, c. 74, 1 Stat. 596. It provided, among other things, for the punishment of any person who published any false and malicious thing against the government of the United States, or any matter intended to excite the people to oppose any law or act of the President in pursuance of law, or to resist, or oppose or defeat, any law. The act provoked great resentment throughout the country, and when it expired by its own limitation in 1801 it was not renewed. From that time until the present no similar legislation, so far as we are aware, has been enacted.

The Espionage Act now under consideration bears slight resemblance to the Sedition Law of 1798. The act as originally drafted provided that every publication "containing any matter of a seditious, anarchistic or treasonable character" should be nonmailable. But when the act was under discussion in the Senate the words above quoted were stricken out; it having been objected that they were too indef-

inite and left too much room for construction. In Cooley's Constitutional Limitations, page 429, that distinguished authority says:

"Repression of full and free discussion is dangerous in any government resting upon the will of the people. The people cannot fail to believe that they are deprived of rights, and will be certain to become discontented, when their discussion of public measures is sought to be circumscribed by the judgment of others upon their temperance or fairness. They must be left at liberty to speak with the freedom which the magnitude of the supposed wrongs appears in their minds to demand; and if they exceed all proper bounds of moderation, the consolation must be, that the evil likely to spring from the violent discussion will probably be less, and its correction by public sentiment more speedy, than if the terrors of the law were brought to bear to prevent the discussion."

In May's Constitutional History, c. 10, it is said that:

"When the press errs, it is by the press itself that its errors are left to be corrected. Repression has ceased to be the policy of rulers, and statesmen have at length fully realized the wise maxim of Lord Bacon, that 'the punishment )of wits enhances their authority, and a forbidden writing is thought to be a certain spark of truth that flies up in the faces of them that seek to tread it out.'"

The policy of the government of the United States has conformed to the doctrine above laid down. But the fact that the policy of the government of the United States has been adverse to limiting freedom of discussion affords little assistance in construing the particular act now under consideration. In Hadden v. The Collector, 5 Wall, 107, 18 L. Ed. 518 (1866), the court speaking through Mr. Justice Field declared that:

"What is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes."

And in Dewey v. U. S., 178 U. S. 510, 521, 20 Sup. Ct. 981, 985, 44 L. Ed. 1170, the court, speaking through Mr. Justice Harlan, declared that:

"This court has nothing to do with questions of mere policy that may be supposed to underlie the action of Congress. * * * Our province is to declare what the law is."

And in White v. U. S., 191 U. S. 545, 551, 24 Sup. Ct. 171, 172, 48 L. Ed. 295 (1903), Mr. Justice Day declared:

"It is equally true that it is the business of courts to decide what the law is, and not by consideration of surmises as to the policy of the government have the effect to adjudge that to be law which has not been so enacted by the Legislature."

[4] Moreover, courts have nothing to do with the wisdom or unwisdom of a legislative act. It is the function of the legislative department to enact law, and of the judicial department to construe and apply it. The judges cannot pass upon the wisdom or the justice of the statute, but are simply to ascertain the intent of the lawmakers as expressed in the enactment, and to give effect thereto. United States v. First National Bank, 234 U. S. 260, 34 Sup. Ct. 846, 58 L.

Ed. 1298. For reasons satisfactory to the law-making body the Espionage Act has been adopted, and being valid is the law of the land.

[5] It is not intended by what has just been said to imply any doubt as to the wisdom of Congress in the enactment of the Espionage Act. The purpose of the act as we understand it was not to repress legitimate criticism of Congress or of the officers of the government, or to prevent any proper discussion looking to the repeal of any legislation which may have been enacted. The United States being at war in defense of American rights, Congress intended by this act, to prevent any use being made of the mails for the dissemination and distribution of publications intended to embarrass and defeat the government in its effort to prosecute the war to a successful termination. The statute is one of great importance and under it the Postmaster General, whose duty it is to execute all laws relating to the postal service, had to determine whether the particular publication in question was mailable or unmailable matter as defined in the act.

The Espionage Act being constitutional, the question which arises, then, is whether the action of the Postmaster General in excluding The Masses from the mails warranted the District Judge in issuing an injunction commanding him to allow it to be transmitted by mail. The Postmaster General is the head of the Post Office Department. The obligations of his oath of office oblige him to see that the provisions of the Espionage Act are carried into effect, so far as they relate to the use of the mail, and that matter declared by the act to be nonmailable shall be excluded from the mails. The performance of that duty involves the exercise of his judgment and discretion. To what extent can the courts control him by injunction in the performance of this duty?

In Decatur v. Paulding, 14 Pet. 497, 599 Appx., 10 L. Ed. 559, 609 (1840), a mandamus to compel the Secretary of the Navy to comply with a resolution passed by Congress granting a pension was refused. The Secretary, acting under the advice of the Attorney General, decided that Mrs. Decatur was not entitled to claim the pension under the resolution as she had applied for and received her pension under the general law, and she could not have both. The opinion was by Chief Justice Taney, who said:

"The duty required by the resolution was to be performed by him (the Secretary of the Navy) as the head of the executive department of the government, in the ordinary discharge of his official duties. In general, such duties, whether imposed by act of Congress, or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise [his] judgment and discretion. * * * The court could not entertain an appeal from the decision of one of the Secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or judgment. Nor can it, by mandamus, act directly upon the officer and guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties."

In United States ex rel. Dunlap v. Black, 128 U. S. 40, 9 Sup. Ct. 12, 32 L. Ed. 354 (1888), the court held that a mandamus to the Commissioner of Pensions was properly refused. The Commissioner had decided adversely an application for an increase of a pension under

21 Stat. 281, c. 236. The opinion was by Mr. Justice Bradley, who said:

"The court will not interfere by mandamus with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the court having no appellate power for that purpose; but when they refuse to act in a case at all, or when, by special statute, or otherwise, a mere ministerial duty is imposed upon them, that is, as service which they are bound to perform without further question, then, if they refuse, a mandamus may be issued to compel them."

In American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90 (1902), the Supreme Court reversed the court below, which had dismissed a bill asking for an injunction to restrain a postmaster from carrying out an order of the Postmaster General withholding mail on the ground that the person to whom it was addressed was engaged in a scheme for obtaining money through the mails by means of fraudulent pretenses. The Supreme Court, in reversing the judgment, did so with instructions to issue the temporary injunction as applied for. The case was decided upon a demurrer, so that the allegations in the bill of complaint were taken as true, and the bill averred facts showing that the complainant's business was legitimate and not fraudulent. If the business was not fraudulent, the Postmaster General had no authority under the act to withhold the mail.

In Riverside Oil Co. v. Hitchcock, 190 U. S. 316, 23 Sup. Ct. 698, 47 L. Ed. 1074 (1903), it was held that neither an injunction nor a mandamus would lie against an officer of the Land Department to control him in discharging an official duty which required the exercise of his judgment and discretion. Mr. Justice Peckham, writing for the court, said:

"Whether he [the Secretary of the Interior] decided right or wrong, is not the question. Having jurisdiction to decide at all, he had necessarily jurisdiction, and it was his duty to decide as he thought the law was, and the courts have no power whatever under those circumstances to review his determination by mandamus or injunction. * * * The responsibility, as well as the power, rests with the Secretary, uncontrolled by the courts."

In Bates & Guild v. Payne, 194 U. S. 106, 24 Sup. Ct. 595, 48 L. Ed. 894 (1904), the bill asked for an injunction to compel the Postmaster General to transmit through the mails, as matter of the second class, a publication alleged to be a periodical and to enjoin him from enforcing an order made by him denying it entry as such. The bill was dismissed and the injunction denied. Mr. Justice Brown, writing for the court, said that:

"Where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong."

Again he says:

"The rule upon this subject may be summarized as follows: That where the decision of questions of fact is committed by Congress to the judgment and

discretion of the head of a department, his decision thereon is conclusive, and that even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they may have the power, and will occasionally exercise the right of so doing."

And he concludes:

"While, as already observed, the question (that decided by the Postmaster General) is one of doubt, we think the decision of the Postmaster General, who is vested by Congress with the power to exercise his judgment and discretion in the matter, should be accepted as final."

In Public Clearing House, supra, the court held that it was within the power of Congress to intrust the Postmaster General with the power of seizing and detaining letters upon evidence satisfactory to himself and that his action would not be reviewed by the court in doubtful cases. The act authorized the Postmaster General, upon evidence satisfactory to him that any person was conducting a scheme or device for obtaining money or property through the mails by fraudulent pretenses, to instruct postmasters at any post office at which registered letters arrived directed to any such person to return the same to the postmaster at the office at which they were originally mailed with the word "Fraudulent" stamped upon the outside.

In Smith v. Hitchcock, 226 U. S. 53, 33 Sup. Ct. 6, 57 L. Ed. 119 (1912), a bill was filed to restrain the Postmaster General from revoking orders according second-class mail privileges to the plaintiffs. The ground of the bill was that the privileges had been annulled without granting the hearing required by the act (31 Stat. 1099, 1107), and that the publications were periodical publications within the meaning of the act (20 Stat. 355, 358, 359). The Postmaster General had decided that the publication was not a "periodical" and could not be carried as second-class matter, but would have to go as third-class and pay the higher rate. Mr. Justice·Holmes, speaking for the court, said:

"Thus a question of law is raised, although, as suggested in Bates & Guild Co. v. Payne, 194 U. S. 106, 108 [24 Sup. Ct. 595, 48 L. Ed. 894], we should not interfere with the decision of the Postmaster General, unless clearly of opinion that it was wrong. * * * We have no such clear opinion."

See, also, Lewis Publishing Co. v. Morgan, 229 U. S. 288, 33 Sup. Ct. 867, 57 L. Ed. 1190; Parish v. MacVeagh, 214 U. S. 124, 131, 29 Sup. Ct. 556, 53 L. Ed. 936; Johnson v. Drew, 171 U. S. 93, 18 Sup. Ct. 800, 43 L. Ed. 88; Burfenning v. Chicago, St. Paul, etc., R. Co., 163 U. S. 321, 323, 16 Sup. Ct. 1018, 41 L. Ed. 175.

[6] This court holds, therefore, that if the Postmaster General has been authorized and directed by Congress not to transmit certain matter by mail, and is to determine whether a particular publication is nonmailable under the law, he is required to use judgment and discretion in so determining, and his decision must be regarded as conclusive by the courts, unless it appears that it is clearly wrong.

We come, therefore, to consider the authority vested by Congress in the Postmaster General to determine whether he acted within his jurisdiction when he excluded the complainant's magazine from the mails. The Espionage Act is entitled:

246 F.—3

"An act to punish acts of interference with foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to .enforce the criminal laws of the United States, and for other purposes."

Title 12 of the. act is the only one relating to the use of the mails. And section 1 of that title expressly declares that:

"Every * * * publication * * * of any kind, in violation of any of the provisions of this act is hereby declared to be nonmailable matter and shall not be conveyed in the mails."

As any publication which is in violation of any provision of the act is nonmailable, an examination of the act as a whole is necessary, and shows that the following matter is made nonmailable:

(1) Any matter advocating or urging treason or forcible resistance to any law of the United States. Title 12, § 3.

(2) Any matter containing information respecting the national defense and which is intended to be used to the injury of the United States or to the advantage of any foreign nation. Title 1, § 1.

(3) Any matter containing information, intended to be communicated to the enemy, with respect to the movement, numbers, description, condition, or disposition of any of the armed forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct of the war, or the plans or conduct of any naval or military operations, or with respect to any measures undertaken or intended for the fortification or defense of any place, or any other information relating to the public defense which might be useful to the enemy. Title 1, § 2.

(4) Any matter, when the United States is at war, containing false statements willfully intended to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies, and matter willfully intended to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, and matter willfully intended to obstruct the recruiting or enlistment service of the United States. Title 1, § 3.

The excluded publication is a magazine known as The Masses. By its own statement it. is a radical and revolutionary publication, not revolutionary, however, in that it desires to overturn existing forms of government by force of arms, as it is opposed to war. It is revolutionary, not only in matters political, but in art and literature and religion as well. It is a monthly publication of about 50 pages, and has a circulation of from 20,000 to 25,000 copies each month. For a number of years it has passed freely through the mails to its subscribers throughout the United States.

[7] The objectionable matter was contained in the August issue and consisted of certain articles. These. were entitled: "A Question," "A Tribute," "Conscientious Objectors," "Friends of American Freedom." Besides these articles, there were four cartoons, which were also objected to. These were entitled: "Liberty Bell," "Conscription," "Making the World Safe for Capitalism," and "Congress and Big Business."

In the article entitled "A Question" the editor writes:

"I would like to know to-day how many men and women there are in America who admire the self-reliance and sacrifice of those who are resisting the conscription law on the ground that they believe it violates the sacred rights and liberties of man. How many of the American population are in accord with the American press when it speaks of the arrest of these men of genuine courage as a 'Round-up.of Slackers'? Are there none to whom this

picture of the American republic adopting toward its citizens the attitude of a rider toward cattle is appalling? I recall the Essays of Emerson, the Poems of Walt Whitman, which sounded a call never heard before in the world's literature, for erect and insuppressible individuality, the courage of solitary faith and heroic assertion of self. It was America's contribution to the ideals of man. * * * I wonder if the number is few to whom this high resolve was the distinction of our American idealism, and who feel inclined to bow their heads to those who are going to jail under the whip of the state, because they will not do what they do not believe in doing. Perhaps there are enough of us, if we make ourselves heard in voice and letter, to modify this ritual of contempt in the daily press, and induce the American government to undertake the imprisonment of heroic young men with a certain sorrowful dignity that will be new in the world."

The article idealizes those who resist the conscription law, and it represents them as heroic. In saying that the law violates sacred rights and is contrary to liberty, and that those who refuse to submit to it are heroes, it incites disobedience to the statute.

The poem entitled "A Tribute" represents as martyrs worthy of admiration two notorious persons who had just been convicted under an indictment charging them with conspiracy to induce persons not to register under the Conscription Act. It reads in part as follows:

"Emma Goldman and Alexander Berkman
Are in prison to-night,
But they have made themselves elemental forces.
Like the water that climbs down the rocks,
Like the wind in the leaves,
Like the gentle night that holds us,
They are working on our destinies,
They are forging the love of the nations."

The statement that these two individuals have made themselves elemental forces akin to the rocks and trees and rivers, under ordinary circumstances, would be harmless; but coming. at this particular time, and after their conviction, the inference being that their greatness grows out their offense and that they are worthy of admiration and honor, it is equivalent to saying that their unlawful conduct is worthy to be followed.

The article "Conscientious Objectors" refers to a number of letters written from English prisons by conscientious objectors. These letters are printed in the same issue of the magazine, and the article recommends those in this country who intend "to stick it out to the end" (resist conscription to the end) to read thoroughly the letters. The article declares:

"We believe that our protestors against government tyranny will be as steadfast as their English comrades. It is not by any means as certain that they will be as polite to their guards and tormentors, but we hope they will remember that these are acting under official compulsion and not as free men. * * * There are some laws which the individual feels that he cannot obey, and which he will suffer any punishment, even that of death, rather than recognize as having authority over him. This fundamental stubbornness of the free soul, against which all the powers of the state are helpless, constitutes a conscientious objection, whatever its original sources may be in political or social opinion. It remains to be demonstrated that a political disapproval of this war can express itself in the same heroic firmness that has in England upheld the Christian objectors to war as murder."

The article, taken as a whole, may well be regarded as intended to encourage objectors to be as steadfast protestors against "government tyranny" as their English comrades. In other words, it is an encouragement to disobey the law.

The article "Friends of American Freedom" is devoted to Alexander Berkman and Emma Goldman, already commented upon in this opinion as having been convicted of a conspiracy to induce persons not to register. The article pays them "tribute of admiration for their courage and devotion." There is an allusion to the fact that Berkman and Goldman had advocated in their paper, Mother Earth, that those liable to the military draft, who do not believe in the war, should refuse to register. The natural effect of it is to encourage those who have objections to war not to register as the Conscription Act requires. Admiration of conspirators convicted of the offense of seeking to defeat the operation of the Conscription Act is equivalent to an approval of their crime and an encouragement to others to disobey the law in like manner.

In considering the cartoons, we may observe that political cartoons have long been used as a very effective means of political propaganda. They were so employed in France during the French Revolution and in England as early as the days of Walpole. In this country they were used during the Revolution, in the War of 1812, and in the Civil War. The brilliant cartoons of Nast, satirizing the Tweed Ring in the city of New York, were conceded at the time to have exerted a powerful influence in the destruction of that corrupt combination. A cartoon may be a leading article. It has been described as "a leading article transformed into a picture." It can express ideas as lucidly and clearly as printed words, and there is no escape from legal responsibility because pictures, rather than words, are used.

[8] In the cartoon entitled "Liberty Bell," the Liberty Bell is presented in a broken form. The idea meant to be conveyed may be that there is no such thing as liberty left in the United States. But whatever it means, taken by itself, it would afford no ground for exclusion from the mails.

The cartoon entitled "Conscription" portrays a youth lying across the mouth of a cannon with his arms chained to the wheels of the gun carriage. "Democracy," in the form of a nude woman, is tied by her extended arms and her crossed feet to a wheel. And "Labor," crouched down on the gun carriage, a pitiable object, is fastened in like manner. A woman is on her knees on the earth at the side of the cannon in utter despair, with her head bent back and her arms uplifted, while a child lies neglected at her side. The counsel for the complainant admits in his brief that this cartoon—

"is a powerful argument against the Conscription Law. It says, in effect, that the youth of the land are by it forced into military service; that the law binds labor to military service as well; that it causes great agony and suffering to the womanhood of the country, and that the mothers of the country with children too small to be subject to the 'Draft' pray to God that the Draft Law may be repealed before their children come to military age, and that Democracy is trampled under foot by such a law. That is what this picture says."

But that is not what it says to us. It seems to us to say: This law murders youth, enslaves labor to its misery, drives womanhood into utter despair and agony, and takes away from democracy its freedom. Its voice is not the voice of patriotism, and its language suggests disloyalty. If counsel wished the court to understand that in his opinion the effect of the cartoon would not be to interfere with enlistment, we are not able to agree with him. That it would interfere, and was intended to interfere, was evidently the opinion of the Postmaster General; and this court cannot say that he was not justified in his conclusion.

The cartoon "Making the World Safe for Capitalism" shows a Russian absorbed in studying a paper marked "Plans for a Genuine Democracy." On one side of him Japan and England appear in a threatening attitude, and on the other Mr. Root and Mr. Russell, members of the commission sent by the United States to Russia, appear in the guise of advisers. Mr. Root has in his hands a noose, labeled "Advice," with which it is intended to entrap or choke to death the Russian Democracy. The court cannot say that the Postmaster General was not warranted in concluding that this cartoon was intended to arouse the resentment of some of our citizens of foreign birth and prevent their enlistment.

In the cartoon "Congress and Big Business" Congress is represented by a disconsolate individual who is ignored by a number of over-developed men of Big Business gathered around a table inspecting a large paper spread over it and labeled "War Plans." Congress is quoted as saying: "Excuse me, gentlemen, where do I come in?" "Big Business" replies: "Run along now; we got through with you when you declared war for us." This cartoon is intended to stir up class hatred of the war and to arouse an unwillingness to serve in the military and naval forces of the United States. The clear import is, if the war was brought on by "Big Business," then let "Big Business" carry it on, and let Labor stand aloof. The court cannot say that the Postmaster General was clearly wrong in concluding that it would interfere with enlistments.

[9] In the case at bar, giving to the complainant the most favorable construction, the burden is upon it to overcome the presumption that the Postmaster General's conclusion is right, or that he has exceeded his power or exercised it wantonly or maliciously. See Judge Mayer's opinion in Sanden v. Morgan (D. C.) 225 Fed. 266, 269 (1915). This the complainant should do by a preponderance of evidence. And this the complainant has not done.

[10] It may be conceded that the language of the statute cannot have one meaning in an indictment and another when the question arises respecting the exclusion of matter from the mail as containing that which violates the provisions of section 3 of title 1. If the magazine is nonmailable under that section, it may be that the editor has committed a crime in publishing it, for which, upon conviction, he may be fined not more than $10,000, or imprisoned for not more than 20 years, or both. The District Judge thought no crime had been committed, and that the magazine was therefore mailable, because

the publication did not in so many words directly advise or counsel a violation of the act. He declared that:

"If one stops short of urging upon others that it is their duty or their interest to resist the law, it seems to me one should not be held to have attempted to cause its violation. If that be not the test, I can see no escape from the conclusion that under this section every political agitation which can be shown to be apt to create a seditious temper is illegal. I am confident that, by such language, Congress had no such revolutionary purpose in view."

This court does not agree that such is the law. If the natural and reasonable effect of what is said is to encourage resistance to a law, and the words are used in an endeavor to persuade to resistance, it is immaterial that the duty to resist is not mentioned, or the interest of the persons addressed in resistance is not suggested. That one may willfully obstruct the enlistment service, without advising in direct language against enlistments, and without stating that to refrain from enlistment is a duty or in one's interest, seems to us too plain for controversy. To obstruct the recruiting or enlistment service, within the meaning of the statute, it is not necessary that there should be a physical obstruction. Anything which impedes, hinders, retards, restrains, or puts an obstacle in the way of recruiting is sufficient. In granting the stay of the injunction until this case could be heard in this court upon the appeal Judge Hough declared that:

"It is at least arguable whether there can be any more direct incitement to action than to hold up to admiration those who do act. Oratio obliqua has always been preferred by rhetoricians to oratio recta; the Beatitudes have for some centuries been considered highly hortatory, though they do not contain the injunction, 'Go thou and do likewise.'"

With this statement we fully agree. Moreover, it is not necessary that an incitement to crime must be direct. At common law the "counseling" which constituted one an accessory before the fact might be indirect. See Wharton's Criminal Law (11th Ed.) § 266. Bishop lays down the rule thus:

"Every man is responsible criminally for what of wrong flows directly from his corrupt intentions. * * * If he awoke into action an indiscriminate power, he is responsible. If he gave directions vaguely and incautiously, and the person receiving them acted according to what he might have foreseen would be the understanding, he is responsible." 1 Bishop on Criminal Law, § 641.

And in Regina v. Sharpe, 3 Cox's C. C. 288, it is laid down that:

"He who inflames people's minds and induces them by violent means, to accomplish an illegal object, is himself a rioter, though he take no part in the riot."

In conclusion, we are satisfied that the publication involved contains no matter advocating or urging treason, insurrection, or forcible resistance to any law of the United States, in violation of section 2 of title 12. The Postmaster General's exclusion of the publication from the mails is not put on the ground that it contained any such matter. It is not so clear that the publication is free from matter which involves an attempt to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States.

The Postmaster General thought it contained matter objectionable on that ground, and a difference of opinion upon that phase of the matter is possible.

The question whether the publication contained matter intended willfully to obstruct the recruiting or enlistment service is less doubtful. Indeed, the court does not hesitate to say that, considering the natural and reasonable effect of the publication, it was intended willfully to obstruct recruiting; and even though we were not convinced that any such intent existed, and were in doubt concerning it, the case would be governed by the principle that the head of a department of the government in a doubtful case will not be overruled by the courts in a matter which involves his judgment and discretion, and which is within his jurisdiction.

The order granting the preliminary injunction is reversed.

WARD, Circuit Judge (concurring). I think the sole ground on which the order of the Postmaster General can be sustained is that some parts of the August number of The Masses were intended to obstruct and do obstruct the recruiting or enlistment service of the United States. This involves a conclusion of fact to be drawn by him from the cartoons and text of this particular number. Advice to resist the law may be indirect as well as direct, and the conclusion of the Postmaster General in matters of fact, whether we agree with him or not, is final. I think it important, however, to say that not every writing, the indirect effect of which is to discourage recruiting or enlistment, is within the statute. In addition to the natural effect of the language on the reader, the intention to discourage is essential. Arguments in favor of immediate peace, or in favor of repealing the Conscription Act, do this indirectly. It is, notwithstanding, the constitutional right of every citizen to express such opinions, both orally and in writing, and Congress cannot be presumed to have intended by the Espionage Act to authorize the Postmaster General to exclude such articles, written honestly and without the intention of advising resistance to the law. His authority in the premises depends exclusively upon the statute, as was well stated by Mr. Justice Peckham in American Magnetic School of Healing v. McAnnulty, 187 U. S. 109, 23 Sup. Ct. 39, 47 L. Ed. 90.

"Here it is contended that the Postmaster General has, in a case not covered by the acts of Congress, excluded from the mails letters addressed to the complainants. His right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and, if no such law exist, then he cannot exclude or refuse to deliver them. Conceding, arguendo, that when a question of fact arises, which, if found in one way, would show a violation of the statutes in question in some particular, the decision of the Postmaster General that such violation had occurred, based upon some evidence to that effect, would be conclusive and final, and not the subject of review by any court, yet to that assumption must be added the statement that if the evidence before the Postmaster General, in any view of the facts, failed to show a violation of any federal law, the determination of that official that such violation existed would not be the determination of a question of fact, but a pure mistake of law on his part, because the facts being conceded, whether they amounted to a violation of the statutes, would be a legal question and not a question of fact."