### UNITED STATES v. NEARING et al.

#### (District Court, S. D. New York. August 1, 1918.)

1. ARMY AND NAVY ☞40—ESPIONAGE ACT—OFFENSES.

Espionage Act June 15, 1917, § 3, making it an offense for any person to make or convey false statements intended to cause insubordination, etc., on the part of the military or naval forces, etc., must be construed as forbidding those publications which would make the authors accessories before the fact to insubordination, etc., and it is doubtful whether the section adds to the common law responsibility of such persons, as insubordination is an offense.

2. ARMY AND NAVY ☞40—ESPIONAGE ACT—OBSTRUCTING ENLISTMENT.

Under Espionage Act June 15, 1917, § 3, denouncing the offense of interference with enlisting, etc., held, that the measure of liability with respect to voluntary enlistment should be treated on the same basis as an attempt to cause insubordination.

3. CRIMINAL LAW ☞72—PRINCIPALS AND ACCESSORIES.

At common law the utterer of written or spoken words is not criminally liable merely because he knows they will reach those who will find in them the cause for criminal acts.

4. ARMY AND NAVY ☞40—OFFENSES.

Under Espionage Act June 15, 1917, § 3, one uttering written or spoken words calculated to cause insubordination and obstruct enlistment, etc., with that intent, is guilty of an offense, though the utterances in themselves do not amount to advice to violate the law.

5. ARMY AND NAVY ☞40—ESPIONAGE ACT—INDICTMENT—SUFFICIENCY.

An indictment averring a conspiracy to violate Espionage Act June 15, 1917. § 3, by causing insubordination in the military or naval forces of the United States, by means of a pamphlet distributed to persons in part belonging to the military forces, and also to obstruct the recruiting service, etc., held, sufficient to charge those offenses.

6. ARMY AND NAVY ☞40—ESPIONAGE ACT—OFFENSES—"OBSTRUCT."

Under Espionage Act June 15, 1917, § 3, denouncing the making or conveying of false reports or statements with intent to obstruct the en-

listment service, etc., one who utters statements tending to obstruct the recruiting service is guilty of the offense denounced, though no enlistments were actually prevented; the word "obstruct" meaning to hinder or impede.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Obstruct.]

7. ARMY AND NAVY ⬦⟳40—ESPIONAGE ACT—INDICTMENT—SUFFICIENCY.
   Two counts of an indictment, charging attempts to cause insubordination in the military and naval forces of the United States and attempts to obstruct the recruiting and enlistment service by writing and publication of pamphlet, *held* insufficient, under Espionage Act June 15, 1917, § 3, because of failure to allege specific intent with which defendants wrote and published the pamphlet.

8. CONSPIRACY ⬦⟳43(6)—INDICTMENT.
   An indictment charging a conspiracy to violate Espionage Act June 15, 1917, § 3, by causing insubordination, etc., in the military forces *held* to sufficiently aver the conspiracy.

9. CONSPIRACY ⬦⟳43(3)—ESPIONAGE—OFFENSES—INDICTMENT.
   An indictment charging that defendants, in violation of Espionage Act June 15, 1917, conspired to urge and pursuade persons subject to military discipline to disobey, etc., *held* sufficient; it not being necessary to aver all the means for carrying out the conspiracy.

10. CONSPIRACY ⬦⟳43(6)—ESPIONAGE ACT—INDICTMENT—SUFFICIENCY.
    An indictment charging conspiracy to violate Espionage Act June 15, 1917, § 3, by causing insubordination, etc., by the circulation of a pamphlet which averred it was circulated among persons subject to military discipline, and also to persons already in the service is sufficient, though not naming the individuals.

11. ARMY AND NAVY ⬦⟳40—ESPIONAGE ACT—OBSTRUCTION OF ENLISTMENT.
    Espionage Act June 15, 1917, § 3, denouncing the uttering of false statements intended to interfere with the enlistment service, if deemed limited to voluntary enlistment, applies to actual gratuitous advice, counsel, or command not to enlist, though it does not apply to advice against enlistment given by near relatives.

12. CORPORATIONS ⬦⟳529—CRIMINAL RESPONSIBILITY.
    A publishing company may, on the theory of responsibility for its agents, be held criminally responsible for the printing and publication, in violation of Espionage Act June 15, 1917, § 3, of a pamphlet containing statements tending to cause insubordination in the military service, etc.

Scott Nearing and the American Socialist Society were indicted for conspiracy to violate and attempted violation of the Espionage Act. On demurrer to the indictment. Demurrers overruled as to all counts, save 3 and 4 of the first indictment.

Demurrer by both defendants to two indictments—the first found on March 21, 1918, and the second on May 13, 1918. The first indictment is in four counts. The first count alleges that the two defendants, of whom one is a New York corporation, conspired with certain unknown persons to violate section 3 of the Espionage Act (Act June 15, 1917, c. 30, 40 Stat. 219), while the United States was at war with Germany; i. e., to cause insubordination, disloyalty, mutiny, and refusal of duty on the part of the military and naval forces of the United States, by means of a pamphlet entitled, "The Great Madness," and by means of its distribution throughout the United States to persons unknown to the grand jury, but who are described as "in part belonging to the military and naval forces of the United States and in other part liable to service therein." The said pamphlet contained "statements and

⬦⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

arguments calculated and intended to create and promote insubordination, disloyalty, mutiny, and refusal of duty" among persons belonging to the military and naval forces of the United States and among those liable to service therein. Various overt acts are alleged, which need not be stated. The second count is of the same character, except that it alleges a conspiracy to obstruct the recruiting and enlistment service of the United States by means of the same publication, and further alleges that the pamphlet contains statements and arguments "calculated and intended to embarrass, obstruct, and interfere with the administration" of the Selective Service Act May 18, 1917, c. 15, 40 Stat. 76, "and to induce persons available and eligible for enlistment and recruiting in the military forces to fail and refuse to enlist for service." The third count alleges that Scott Nearing wrote the pamphlet in question and the American Socialist Society printed and published it, and offered it for sale. This count is for attempting to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval forces of the United States. The fourth count is the same, except that it is for "willfully attempting to obstruct the recruiting and enlistment service of the United States."

The second indictment consists likewise of four counts. The first count alleges a conspiracy between the defendants to cause or attempt to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval forces of the United States by urging, inducing, and persuading members of the military and naval forces of the United States and persons liable to service under the Selective Service Act, when such persons should be inducted into the military service, to disobey their superiors and the like, and that it was a part of the conspiracy of the defendants to effect their purposes by the publication of "The Great Madness," written by the defendant Nearing, and distributed by the corporation defendant, which was designed to contain statements calculated and intended to create and promote insubordination, disloyalty, mutiny, and refusal of duty among persons belonging to the military and naval forces of the United States and among those liable to service therein. The overt acts, as in the former indictment, need not be detailed. The second count alleges a conspiracy to obstruct the recruiting and enlistment service of the United States, by retarding the increase of the military establishment, and that it was a part of the conspiracy for the defendant to distribute the pamphlet written by the defendant Nearing to persons who are described in part as liable to service in the military forces of the United States under the Selective Service Act and in part to persons available and eligible for enlistment and recruiting in said service; said pamphlet being designed to contain and containing statements intended to persuade, encourage, and solicit persons liable to service to refuse to submit to registration and draft and to induce persons liable and eligible for enlistment and service to fail and refuse to enlist for the same. The third count is for the substantive violation of the Espionage Act in attempting to cause insubordination by encouraging and soliciting members of the military and naval services and persons liable to the draft after induction to disobey lawful commands of their superiors and the like. This attempt was made by the publication of the pamphlet, which contained statements calculated and intended to promote insubordination, disloyalty, mutiny, and refusal of duty among such persons. The fourth count is for obstructing the recruiting and enlisting service of the United States by the publication of the pamphlet among persons who are described as in part liable to service under the Selective Service Act and in other part available and eligible for enlistment and recruiting; the pamphlet containing statements calculated and intended to induce, encourage, persuade, and solicit persons liable to service in the military service of the United States to refuse to submit to the draft and persons eligible for enlistment and recruiting to fail and refuse to enlist.

The pamphlet in question undertakes to show that America's entrance into the war was the result of capitalist intrigue. The "plutocracy," as it is called, finding its hold upon the political and economic life of the nation en-

dangered by changes in public opinion, seized upon the instinctive martial responsiveness of the people to rehabilitate its falling power. There was no cause at issue which could in the least concern the interests of the people; they were tricked and cajoled into the most destructive of all wars by a stealthy and dishonest propaganda, which played upon their primitive sense of tribal gregariousness and involved them in a conflict whose issues would only serve to fasten more securely upon them the domination of the capitalist classes. That class, in pursuance of this design and through the fear of "labor solidarity," with its accompanying shortage of cheap labor, secured conscription. It was a device which at once struck at the power of organized workmen and offered a means for the economic exploitation of Central and South America. It fastened upon America that militarism which the capitalists who contrived the war affected to condemn. It was a victory for "plutocracy," which was at once reflected in the acclaim of their venal press, and the increase in value of their bonds and stocks. The political measures which the author recommends as remedies do not involve any disobedience to existing law; they consist of political agitation by discussion and in the press, the "capture" of the schools, "industrial and political solidarity," "the elimination of all profit from industry," "equal opportunity and justice for all." A complete analysis of the whole pamphlet, which consists of 44 pages, would be too extended to set out in detail, but the substance is as given. The manner and diction is intolerant and violent, after the common tradition in revolutionary propaganda. It is obviously inflammatory to the feelings of such readers as believe themselves unjustly treated by the existing order, which it presents as unqualifiedly noxious to the body politic and proper only for immediate destruction.

The defendant's argument upon this branch of the case is substantially as follows: The pamphlet does not cross the line of political agitation; there is no suggestion, direct or indirect, that any means shall be employed in violation of existing law. On the contrary, the recommendations of the author can only be read to include recognized political means. The only possible effect which can fall within the statute is that some readers, subject to the draft or already in the military service, may be stimulated to evade, or disregard, their obligations. This is a possible result of any political agitation, since many will not distinguish between the mischief of the existing order and the fact that it is supported by law. To prosecute those whose propaganda is directed towards the repeal of such an order involves a perpetuation of that order, whether right or wrong, since it chokes the opportunity for any expression of opinion that might in the end change it. Whatever the war powers of Congress in the suppression of public discussion, at least they must be explicitly exercised. It is contrary to every canon of statutory construction to extend the scope of a statute only prohibiting incitement to mutiny and obstruction of the recruiting and enlistment service, so as to include the indirect effects of a public discussion, in itself quite lawful.

Morris Hillquit, of New York City, for the demurrer.
Vincent H. Rothwell, of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). [1] The two first counts of both indictments allege a conspiracy to cause insubordination in the army and to obstruct the enlistment service by the publication of the pamphlet above described. We are to suppose that the conspiracy contemplated and intended that the pamphlet should be circulated among present or future members of the army, and persons subject to the draft and to voluntary enlistment, and that the pamphlet was chosen as a means apt to cause the first to become insubordinate and the second to evade the draft or refuse enlistment. If the conspiracy had been successful, these results

would have followed. Hence the question is necessarily presented whether the accomplishment of that result in that way would have made the author criminally responsible for the results against which the statute is directed. It must be remembered that, in so far as the statute forbids causing insubordination, it forbids incitement to the commission of crime, since all insubordination is a crime committed by the independent will of others. It must therefore be taken as forbidding those acts which would make the authors accessories before the fact to insubordination, disloyalty, refusal of duty, and the like. Indeed, it is doubtful whether that clause adds to the criminal responsibility at common law of those who should cause or attempt to cause others to commit such crimes.

[2] The same thing is true of the second count, for obstructing the enlistment service. Construing this as including only voluntary enlistment, I shall show later that the statute meant to cover at least active and gratuitous advice, counsel, or command not to enlist; and by analogy I should say that the measure of liability should be the same as though the refusal to volunteer were a crime, and as though the question were whether the defendants were accessories. The result —i. e., refusal to volunteer—the statute does not positively forbid, but it deprecates it. At least we may safely say that the measure of liability ought not to be larger when the result is not a crime than when it is. For the present I shall leave it so, and assume that in both clauses the question is: What words make their utterer responsible for crimes which in the course of nature, including the wills of others, may be expected to follow from them?

[3-5] That the author of words may in fact be the cause of the commission of crime by others is a trite enough observation. Any discussion of existing laws, designed to show that they are mistaken in means, or unjust in policy, may have that result. Every one knows that the obligation of law in the minds of many men depends altogether upon their approval of its purposes, and that to arouse their disapproval is to terminate their obedience. Indeed, there are few whose allegiance to any given law is not modified by their opinion of its justice, and the measure of whose obedience does not turn in some degree upon that factor.

At common law the utterer of written or spoken words is not criminally liable merely because he knows they will reach those who will find in them the excuse for criminal acts. On the contrary, the rule has always been that, to establish criminal responsibility, the words uttered must amount to counsel or advice or command to commit the forbidden acts, and this is the classic form of expression. 4 Blackstone, 36, 37. Of course, the counsel or advice need not be explicit, since the meaning of words comprises what their hearers understand them to convey. Yet the terms, "counsel" or "advice" have a content which can be determined objectively, and do not depend upon the subjective intent of their author. I tried unsuccessfully in Masses Pub. Co. v. Patten (D. C.) 244 Fed. 535, to suggest an analysis of what is included in those terms, and shall not attempt it again. It is enough here merely to suggest that they must have limits determined by the

character of the words themselves. That there may be language, as, for instance, Mark Antony's funeral oration, which can in fact counsel violence while it even expressly discountenances it, is true enough; but that raises only the situation, familiar enough everywhere in the law, and already mentioned, of the actual meaning of words to their hearers.

Now, there is nothing in the pamphlet in question which can, as I read it, be understood to constitute any counsel or advice or command to obstruct the draft or to become insubordinate. At least, if it be the pleader's purpose to allege that they reached persons who so understood them, and that the defendants knew of this likelihood, that must be especially alleged. Taken with any interpretation which they can fairly bear, they remain entirely within the range of discussion, and at common law would not, I think, subject their author to criminal responsibility for the results, no matter what his intent.

Whatever may be the rule at common law, I understand Masses Pub. Co. v. Patten, 246 Fed. 24, 158 C. C. A. 250, Ann. Cas. 1918B, 999, to lay down an added measure of criminal liability under this statute to the utterance of words which may cause insubordination, or may obstruct the enlistment service. In that case, it is true, there is language which, taken broadly, can be made to mean that the author is liable if he merely knows that his words will so result. This I can hardly think can have been the significance of the decision, since, as I have already shown, the inevitable consequence would be to imperil any discussion of public matters. It certainly was not the purpose of that case to do so, or indeed to insist that the style or manner of the discussion must measure with any standard of taste or temperance. Such a result would be foreign to the whole history of the subject. The test as laid down in that case was, I think, this: That though in the form of public discussion words, which might not themselves amount to advice or counsel to violate the law, would nevertheless make their author criminally responsible if they were in fact the cause of the results forbidden, and if they were uttered with the specific intent of producing those results. In short, the test was made, not objective only, but in part subjective, as is indeed often the case in the definition of crime. At least this is as I understand that case, and it is in this sense that the rule was applied in the trial of the first indictment against the Masses Publishing Company, which was the direct result of the decision of the Circuit Court of Appeals.

Now, in the first two counts of each indictment, the defendants are alleged to have intended by the words used to cause insubordination and to obstruct the enlistment service. It is certainly true, and can hardly be denied, that the pamphlet might be an efficient argument, and so a cause in the minds of men, to secure that result. Such utterances and such a manner would produce a state of mind prone to insubordination and to evasion. Thus both conditions are fulfilled which are required, not, to be sure, under the common-law rules in such matters, but in the decision mentioned.

[6, 7] Similarly of the third and fourth counts of the second indictment. The third is for attempting to cause insubordination by

publishing the pamphlet with the requisite intent. A conspiracy is indeed hardly less than a joint attempt, at least if the overt acts are considered as a part of the crime. The fourth count is somewhat different, since it alleges the substantive crime of obstructing enlistment. If for that crime success was necessary, or indeed any results upon enlistment, the indictment would be insufficient; but I think it is not. The statute obviously forbids the effort, not the result. One obstructs when one hinders or impedes, and it is no answer that the obstruction is successfully passed over. If words are enough, and they surely are, under this clause nobody would hesitate to say, I think, that a man who went about persuading others not to enlist, or to evade the draft, was not obstructing the draft, though he did not succeed in a single case. In any event this was specifically held by the Circuit Court of Appeals in Masses Pub. Co. v. Patten, supra.

It follows, however, from the foregoing discussion, that the third and fourth counts of the first indictment are bad, for omission to allege the requisite specific intent.

[8] The defendants make several other objections. They say that the conspiracy is formally not well laid. The pleader has in each case first proceeded to lay the count in the words of the statute, which might not have been sufficient, though often it is; but he has not stopped there. In the first count of the first indictment he has charged that the conspiracy contemplated the publication of the pamphlet. Since the expression of opinion is not absolutely privileged, but is conditional only upon intent, under the doctrine mentioned, the defendants, if they succeeded in their purpose, would be guilty of the substantive crime. The same is true of the second count of that indictment. Nothing is lacking to make the pleading specific and to avoid the allegation of conclusions of law.

[9] The first count of the second indictment is broader. It lays a conspiracy by which the defendants were to urge and persuade persons subject to military discipline to disobey their superiors, to be unfaithful to the government, to rebel against the authorities, and to refuse their duties. The conspiracy might have been as general as this language. An agreement to violate the law need not go into specific acts; it may not have gone so far, and yet be certain enough to comprise in its general terms unlawful conduct. Thus a conspiracy to stir up insubordination and mutiny would be complete, though the parties had not determined on all the means. In this count, as a part of the means, the publication of the pamphlet is set forth. If the conspiracy included only this, the count would be ample, just as the counts in the first indictment. It is not necessarily true that any other means had been settled upon; but, if there be such, they may be reached only by bill of particulars. The same is true of the second count.

The third and fourth counts are also sufficient in this regard. They set forth the pamphlet as the means by which the results were to be accomplished and no other means could be proved. As the pamphlet may be a sufficient means, under the rule mentioned, the counts do not lack specification, nor are they faulty as involving any legal conclusions.

[10] Again, the defendants allege that the pleadings are faulty in failing to allege that the pamphlet was to be circulated among those who could be debauched in their duty. I think not. In the first indictment the pleader says that the pamphlet was to be circulated among those subject to military discipline and to the draft, and to those eligible to enlistment. The description is of persons described as so subject and so eligible, but unknown individually. This is good pleading under any rule. In the first and third counts of the second indictment these allegations are a little more specific. They include persons already in the service and those subject to the draft when inducted. The names are not necessary. The second and fourth counts follow the form of the earlier indictment.

[11] Further, the defendants insist that "obstructing the recruiting and enlistment service" does not include the draft in any event, and as to voluntary enlistment that it includes only the officers charged with the duty of recruiting and enlisting. The question whether the word "enlistment" covers drafted men is certainly not free from doubt. The Oxford Dictionary defines "enlist" as "to enroll on the list of a military body; to engage as a soldier"—apparently including both voluntary and involuntary enrollment. In Babbitt v. U. S., 16 Ct. Cl. 202, 213, it was said to apply only to voluntary enlistment; but the contrary was ruled in Sheffield v. Otis, 107 Mass. 282, and Bouvier's Law Dictionary defines it inclusively of any form of listing. In Tyler v. Pomeroy, 90 Mass. (8 Allen) 480, there is a long historical discussion, not directly touching the question, but showing how the term was used in England, where there was no conscription. However it may be, I think that the question is not raised here, because the pamphlet obstructs the voluntary enlistment service, always assuming the existence of the rule in Masses Publishing Co. v. Patten, supra. Even if I were to accept the limited construction of the defendants, that that "service" includes only those officials concerned with voluntary enlistment, the same result would follow. These officials stimulate voluntary enlistment by advertisement, publicity, and every imaginable device. To persuade or advise or counsel eligible persons not to volunteer certainly obstructs the purposes of that service, whether the effort be successful or not. This is at least one of the evils at which the statute aims. It means to prevent the undoing of the work of the "service"; perhaps it means more.

It will perhaps be asked if this includes all bona fide advice to an eligible not to volunteer, as, for example, by a wife or a father, on the score of duty. Obviously not. If an eligible asks advice of any one, or if a gratuitous adviser has an interest or duty to give advice, the law does not forbid him. But the statute does not recognize it as a duty imposed upon every citizen, no matter how strong his convictions may be, gratuitously to intervene in the decision of its citizens. The purpose is good in the view of the statute, and such tolerance as it allows to those who do not think it good does not extend to spontaneous persuasion of those who are eligible. So far the statute enforces its decision, regardless of differences of opinion among its citizens; they must not meddle because they do not agree.

The statute, therefore, would in any event extend to advice or counsel which had not the excuse of interest or a recognized duty; but under the rule in Masses Pub. Co. v. Patten, supra, it must be held to go further, and to include also the utterance of words which do not advise or counsel, but which are apt to dissuade eligibles and are uttered with that specific intent. Hence the counts for obstruction are good, no matter how "enlistment" be understood.

[12] Finally, the defendants urge that a corporation cannot be guilty of the crime of conspiracy, or of any crime involving specific intent. This question simply turns upon how far the law has gone in imputing to a corporation the acts of its agents. Specifically it turns upon how far a publishing company, authorized to publish a pamphlet, is responsible for the acts of its officers, when actuated by the requisite intent. It is a question upon which the law has always tended towards larger and larger liability. In torts the liability is now established in the kindred case of libel (Evening Journal v. McDermott, 44 N. J. Law, 430, 43 Am. Rep. 392), as in malicious prosecution (Cornford v. Carleton Bank, [1889] 1 Q. B. 392). Certainly corporations may be guilty of criminal frauds. Cohen v. U. S., 157 Fed. 651, 85 C. C. A. 113; Kaufman v. U. S., 212 Fed. 613, 129 C. C. A. 149, Ann. Cas. 1916C, 466. Now, there is no distinction in essence between the civil and the criminal liability of corporations, based upon the element of intent or wrongful purpose. Each is merely an imputation to the corporation of the mental condition of its agents. It was, it is true, for long supposed that the criminal liability of corporations could not extend beyond the neglect of those positive duties imposed by law; but that depended upon the theory that acts of malfeasance being illegal must be ultra vires. It did not survive a more generous view of the doctrine of ultra vires. Joplin Mercantile Co. v. U. S., 213 Fed. 926, 935, 131 C. C. A. 160, Ann. Cas. 1916C, 470, a case affirmed without consideration of this question in Joplin Mercantile Co. v. U. S., 236 U. S. 531, 35 Sup. Ct. 291, 59 L. Ed. 705. That the criminal liability of a corporation is to be determined by the kinship of the act to the powers of the officials, who commit it is true enough, but neither the doctrine of ultra vires, nor the difficulty of imputing intent or motive, should be regarded any longer to determine the result. Bishop, New Criminal Law, § 417(4).

I conclude, therefore, that the demurrers to the first and second counts of the first indictment must be overruled, and to the third and fourth sustained. The demurrers to the second indictment must be overruled.